## Adoption of Holly & others.[1]

Plymouth. October 5, 2000. - November 21, 2000.

Present: Marshall, C.J., Abrams, Greaney, Ireland, Spina, Cowin, & Sosman, JJ.

*Adoption,* Dispensing with parent's consent. *Parent and Child,* Adoption, Dispensing with parent's consent to adoption. *Constitutional Law,* Assistance of counsel. *Due Process of Law,* Notice, Adoption. *Practice, Civil,* Assistance of counsel, Adoption. *Notice,* Timeliness.

A motion for service by publication of a notice of a proceeding to dispense with parental consent to adoption, made pursuant to Rule 2 of the Rules of the Juvenile Court and G. L. c. 119, § 24, was not invalid for inadvertent failure to set forth that the Department of Social Services had made "diligent efforts" to ascertain the father's residence or whereabouts; further, the record demonstrated that the department had in fact made such "diligent efforts"; moreover, any other alleged errors in the publication procedure did not render notice of the proceedings constitutionally deficient. [685-687]

Where a father, properly served by publication with notice of a proceeding to dispense with consent to adoption, did not appear before the Juvenile Court to contest the petition or to demonstrate his indigency, the judge was not obligated under G. L. c. 119, § 29, or under Standing Order of the Juvenile Court 1-93(4), to appoint counsel for the father. [687-689] Ireland, J., concurring.

In a proceeding to dispense with parental consent to adoption, the father did not demonstrate that his appointed counsel's representation deprived him of a substantial ground of defense or otherwise caused him prejudice. [690-691]

Petitions filed in the Brockton Division of the Juvenile Court Department on March 20, 1998.

The cases were heard by *Robert F. Murray,* J., and motions for a new trial were heard by him.

After review by the Appeals Court, the Supreme Judicial Court granted leave to obtain further appellate review.

*R. Scott Miller, Jr.,* for K.L.

*Susan F. Drogin* for S.C.

[1]The other three children are Mike, Paul, and Nora. The names assigned to the children are pseudonyms.

*Virginia A. Peel*, Special Assistant Attorney General (*Katherine M. Potter* with her) for Department of Social Services.

*David A.F. Lewis* for the children.

*R. Susan Dillard & Andrew L. Cohen*, Committee for Public Counsel Services, for Committee for Public Counsel Services, amicus curiae, submitted a brief.

GREANEY, J. After a trial, a judge in the Brockton Division of the Juvenile Court Department found S.C., the father of Holly and Mike, and K.L., the father of Paul and Nora,[2] currently unfit to assume parental responsibility for their children, and that it was in the best interests of the children to terminate S.C.'s and K.L.'s rights to consent to the adoption of their children. The fathers appealed from the decrees permitting adoption and the orders denying their motions for a new trial. In an unpublished memorandum and order entered pursuant to its rule 1:28, the Appeals Court affirmed the decrees and orders. See *Adoption of Holly*, 49 Mass. App. Ct. 1103 (2000). We granted the fathers' applications for further appellate review. S.C. argues that the judge abused his discretion in denying his motion for a new trial, asserting that he was not afforded constitutionally sufficient notice of the proceeding to terminate his parental rights, and that he was improperly deprived of his constitutional and statutory right to counsel. Represented by new counsel on appeal, K.L. argues that the judge erred in denying his motion for a new trial because his trial counsel afforded him ineffective representation, and because the affidavits supporting the motion, coupled with the ineffective assistance of his trial counsel, demonstrate that the judge wrongfully concluded that it was in the children's best interests that they be placed for adoption. We affirm the decrees dispensing with each father's consent to his children's adoption and the orders denying the motions for a new trial.

We first summarize the relevant procedural history. On March 20, 1998, the Department of Social Services (department) filed a care and protection petition pursuant to G. L. c. 119, § 24, in the Juvenile Court on behalf of Holly, Mike, Paul, and Nora. The petition included a request that the court dispense with the need for parental consent to the adoption of the children. Sum-

---

[2]The children have the same mother, L.A. While the paternity of the children has never been established by law, neither S.C. nor K.L. denies paternity.

monses issued for the mother, L.A., and for the fathers, S.C. and K.L. Counsel was appointed for the children, and for L.A. and K.L. The department was granted temporary custody of the children.

On June 16, 1998, the department moved to serve S.C., or any unknown, unnamed father of Holly and Mike, by publication because the current whereabouts of S.C. were unknown, as was S.C.'s last current address. This motion was allowed, and S.C. was served by publication in two newspapers of general circulation, The Brockton Enterprise and The San Juan Star (San Juan, Puerto Rico), on three successive weeks. S.C. never filed an objection to the department's petition, never filed an appearance in the case, and never made any inquiry of the court regarding the proceedings.

A trial on the petition was conducted in November, 1998. L.A. and K.L. appeared for trial, and each was represented by counsel. S.C. failed to appear.

After the trial, the mother, L.A., executed a stipulation for the entry of decrees, in which she withdrew her objection to the department's petition for adoption and waived her right to appeal. She also entered into an agreement with the children's preadoptive parents in which they agreed to provide her with an annual progress report concerning the children, together with their photographs.

The judge entered a detailed decision containing findings of fact and conclusions of law. The children were adjudicated in need of care and protection and were committed to the permanent custody of the department. The judge found, by clear and convincing evidence, that L.A., K.L., and S.C. were unfit to continue or assume parental responsibilities, and that it was in the children's best interests to dispense with the need for consent by any parent to the children's adoption. The judge also found that the department's adoption plan for the children was in their best interests. Decrees dispensing with the need for parental consent to adoption were entered. Subsequently, the fathers appealed from these decrees, and, each, represented by counsel,[3] filed separate motions for a new trial, which the judge denied without an evidentiary hearing.

We summarize the findings of fact made by the judge. L.A. and S.C. became involved when they were young teenagers.

[3]K.L. was represented by new counsel, who served as his appellate counsel.

L.A. gave birth to their first child, Holly, on February 16, 1993, when L.A. was only fifteen years old. After giving birth to their second child, Mike, on June 1, 1994,[4] L.A. dropped out of the tenth grade of school. L.A. and S.C. remained together, unwed, until some time in 1995.

During their time together, S.C. was "in and out of jail"; "abused alcohol, crack and cocaine"; "cheated" on L.A.; provided only intermittent, minimal financial assistance to his children; and was physically and verbally abusive to L.A. The children witnessed some of the incidents of S.C.'s abuse toward their mother. As of April, 1999, S.C. had not seen his children in three years.

After L.A. left S.C., she moved into an apartment with K.L.'s sister. L.A. began her relationship with K.L. when she was seventeen years old; Holly was two years old and Mike was five months old. Shortly into her relationship with K.L., L.A. became pregnant and moved with K.L. into his mother's home.

K.L.'s family had been involved with the department when he was growing up due to neglect and his mother's substance abuse. As a child, K.L. witnessed domestic abuse in his home. His stepfather drank heavily and physically abused his mother.

K.L. has a history of juvenile delinquency charges, including three assault and battery charges, two larceny charges, and a charge of breaking and entering. He was expelled from school at the age of fifteen. K.L. began drinking alcohol at the same age. He only stopped drinking five months prior to the court's investigation in these proceedings.

K.L. has never lived on his own. He has never been employed. Although he would like to work, K.L. has never been able to find a good job due to his inability to work with people. He fears "explod[ing] on people" as he has done in the past. K.L. spends his days taking walks, going to the store, and helping his mother. He is cognitively limited and unable to read.

K.L. and L.A.'s relationship was characterized by K.L.'s verbal, physical, and sexual abuse of L.A., commencing when L.A. was three months pregnant with Paul. Throughout L.A.'s pregnancy with Paul, K.L. denied fathering Paul; called L.A. a "bitch" and a "slut"; struck L.A. in her head and face; hit L.A.

---

[4]Although nothing turns on this particular fact, evidence in the record indicates that Mike was born on December 22, 1994.

with a broom; slapped L.A. and choked her; frequently beat L.A.; threatened to kill and rape L.A.; threatened to hurt Holly and Mike if L.A. left him; and on several occasions, held a stolen, loaded shotgun, which he obtained from a friend, to L.A.'s head and said, "Admit that you are a slut." Holly and Mike were present during some of the abuse, or heard K.L. yelling from their room. When Paul was born, on April 11, 1996, he suffered medical complications due to the stress he endured from K.L.'s physical abuse of L.A. during her pregnancy. Nora was conceived by L.A. as a result of a rape by K.L. The abuse K.L. inflicted on L.A. lasted until she left him in October, 1997. All of the children at sometime witnessed this abuse.

During K.L. and L.A.'s relationship, K.L. was also verbally and physically abusive to Holly and Mike. K.L. made Holly stand in the corner for four hours at a time; picked Holly up by her hair and dropped her to the floor; yelled and swore at Holly and made her eat at a table separate from everyone else; called Holly "a little spic" and a "bitch"; yelled at Mike when he would cry at night; hit eight month old Mike across his face and bottom due to his crying; and called Mike racially derogatory names.

L.A. was the sole caretaker of the children. She prepared their meals, did their laundry, and put them to bed. K.L. ordered L.A. to cook him meals and wash his laundry.

The department first became involved with the family in September, 1997, when a mandated reporter filed a report alleging neglect on behalf of the children pursuant to G. L. c. 119, § 51A (51A report). The reporter, who had responded to a domestic assault call, alleged that K.L. had assaulted L.A., knocking her onto a table, causing a laceration for which she was treated. The children were present in the home during the assault. The home was in disarray, furniture was upended, and food was dumped on the floor. K.L. fled the scene, leaving the children alone. A warrant issued for his arrest. Later, during the department's investigation of the 51A report, K.L. admitted to physically abusing L.A., and "disciplin[ing]" the children by being verbally and physically abusive toward them.

The department offered services to L.A. and the children, and helped L.A. move into a battered women's shelter with the children. Initially, L.A. participated in services and attempted to care for the children. While at the shelter, L.A. obtained a

protective order against K.L. The department also offered services to K.L., but initially he neglected to respond to their offers.

L.A. subsequently informed the department that she was overwhelmed with taking care of the children, and she could not even meet her own needs. Staff members from the shelter reported that L.A. was not adequately supervising the children and was unable to take care of them. L.A. agreed to place the children in foster care.

K.L. eventually was arrested on assault charges brought by L.A. K.L. visited the department several times after L.A. and the children moved out. He expressed, at best, minimal interest in his children, was inconsistent in attending a batterers' program, or other services recommended by the department, and was reluctant to find work because he was afraid he might explode and harm his coworkers. During a visit with a social worker, K.L. admitted that he was unable to provide for his children financially, cognitively, or emotionally.

L.A. eventually decided to surrender the children for adoption. When the department informed K.L. that it was seeking an adoptive home for all four children to be placed together, he stated that he thought it was a good idea. By October, 1998, K.L. was no longer participating in any services and expressed no interest in the children.

The preadoptive parents have been married for ten years and have no children of their own. They have flexible work schedules that will enable them to spend significant amounts of time with the children. During their visits with the children, the preadoptive parents have demonstrated that they are committed to caring for the children, and have the means and ability to do so.

We turn now to the issues on appeal.

1. S.C. claims that he was deprived of his constitutional right to notice of the termination proceedings because the department failed to comply with requirements for notice set forth in Rule 2 of the Rules of the Juvenile Court (2000), and G. L. c. 119, § 24. We reject these contentions.

Rule 2 applies to service of process in actions for care and protection proceedings, "including actions in which the need for parental consent to adoption is in issue." See Rule 1 of the Rules of the Juvenile Court. The rule permits service of process

on a parent by publication, "[i]f neither the place of residence nor whereabouts of a parent is known, on a written motion of the petitioner setting forth the diligent efforts made to ascertain said place of residence or whereabouts." Rule 2 (B). S.C. asserts that the department's motion for service by publication should not have been allowed because the department failed to set forth in its motion that it had made "diligent efforts" to ascertain his whereabouts. S.C. also contends that the department's showing of its "diligent efforts," made after the fact in response to his motion for a new trial, is inadequate.

The department should have set forth in its motion seeking service by publication what "diligent efforts" had been made to locate S.C. This oversight, however, did not deprive S.C. of his constitutional right to notice because the department had in fact made "diligent efforts" to locate S.C.; additional efforts would have been futile; and S.C. was afforded constructive notice, by publication, "reasonably calculated, under all the circumstances, to apprise [him] of the pendency of the action and afford [him] an opportunity to present [his] objections." *Adoption of Hugh*, 35 Mass. App. Ct. 346, 350 (1993), quoting *Mullane* v. *Central Hanover Bank & Trust Co.*, 339 U.S. 306, 314 (1950).

The record demonstrates that the department made numerous attempts to locate S.C. both before filing its motion for service by publication and after the motion had been allowed. Social workers for the department repeatedly inquired of L.A. to ascertain S.C.'s whereabouts or information that might lead to locating him. L.A. consistently stated that she did not know S.C.'s address, or even in what State he was currently living. In addition, social workers made inquiries about S.C.'s whereabouts to the court-appointed investigator, S.C.'s mother, the children's foster families, and the children's day care provider. With the exception of S.C.'s mother,[5] none of these sources had any information as to where or how S.C. could be located. One social worker made contact with the only person having S.C.'s surname listed in the local telephone directory.

Other efforts by the department, had they been made, also would have been futile because, throughout this time period, S.C. was trying to hide. After his return to Massachusetts from Florida in March, 1998, until June, 1998, S.C. did not want to be located because he needed to "straighten out an outstanding

_____
[5]S.C.'s mother believed that he was "living somewhere in Boston," but did not know where.

warrant."[6] Thereafter, from June 21, 1998, until December 12, 1998,[7] S.C. did not inform his mother (or any of the persons questioned by the department, the department, or the Juvenile Court) of his whereabouts because he was incarcerated. We reject S.C.'s contention that the department could have located him during that time because Holly had told a social worker that her "real daddy [was] in jail." Holly's statement was made in May, 1998, when S.C. was not yet incarcerated. In sum, the department had no leads, no suggestive sources, and no other information that might enable it to track S.C. down.

Finally, we reject S.C.'s claims that errors in the clerk-magistrate's order for service by publication, in violation of G. L. c. 119, § 24, and rule 2 (E) (1), and an error in the department's affidavits of notice of publication, rendered notice of the proceedings constitutionally deficient. While more care should have been taken to complete these materials properly (which have a prescribed form, see Standing Order 1-93 of the Juvenile Court), we agree with the judge that the "alleged errors . . . had no effect on the actual published notice which is the vehicle upon which the father would receive notice." (We also note that S.C. does not allege that the actual publications were in any way deficient). We conclude, in the circumstances, that the judge correctly concluded that S.C. received notice of the proceedings.

2. In his decision on S.C.'s motion for a new trial, the judge concluded that, because S.C. had been given proper notice of the parental rights termination proceedings, "his contention regarding failure to appoint counsel has been rendered moot." S.C. asserts that this ruling directly contradicts standing order 1-93 (4), which, he claims, requires Juvenile Court judges to appoint counsel in all cases for all identified parents. He further maintains that he was deprived of his constitutional right to counsel and statutory right to counsel under G. L. c. 119, § 29. We disagree.

S.C. ignores the fact that, before a constitutional right to counsel, or a statutory right to counsel under G. L. c. 119, § 29, attaches, a parent must first come forward and appear, or in

---

[6]There was information in the record explaining that, before S.C. returned to Massachusetts, he learned that L.A. had told his brother that she was giving up S.C.'s children for adoption.

[7]Although S.C. has not presented any evidence corroborating these dates of his incarceration, none of the other parties contests them.

some way indicate a desire to be heard or to contest the petition, and must demonstrate his or her indigence. See *Department of Pub. Welfare* v. *J.K.B.*, 379 Mass. 1, 4 n.4 (1979). See also G. L. c. 119, § 29. In *Department of Pub. Welfare* v. *J.K.B.*, *supra* at 3, 6, this court concluded that, under the Fourteenth Amendment to the Constitution of the United States, and art. 10 of the Declaration of Rights of the Massachusetts Constitution, "an *indigent* parent has a constitutional right to court-appointed counsel in a *contested* proceeding to terminate parental rights" (emphasis supplied). Counsel is not necessary when an indigent parent decides not to contest a petition, and to obtain counsel, an indigent parent must "timely make his or her decision [whether to contest a petition or be heard] known to the court." *Id.* at 4 n.4.

Similarly, the language of G. L. c. 119, § 29, obligates a parent to appear before the court and demonstrate indigency before having counsel appointed. General Laws c. 119, § 29, provides, in pertinent part, that "[t]he parent . . . of such child shall have and shall be informed of the right to counsel at all hearings under said sections and in any other proceeding regarding child custody where the department of social services . . . is a party . . . and if said parent . . . is financially unable to retain counsel, the court shall appoint counsel for said parent . . . ." It is obvious from this statutory language that a parent must first demonstrate indigency before counsel is appointed. In this case, the published notice to S.C. informed him of the nature of the proceedings; the date, time, and location of the next hearing; and as far as relevant here, his right to retain counsel or request the appointment of counsel, and the consequences of a failure to appear. See Standing Order 1-93. S.C. failed to appear or to make contact with the court, and he did not contest the petition or complete an affidavit of indigency. In view of S.C.'s efforts to remain hidden, until after the trial had been concluded, S.C. was not deprived of either his constitutional or statutory right to counsel.

Apart from this, S.C. argues that the failure to appoint counsel for him directly contravened standing order 1-93 (4), which reads as follows: "In every care and protection case counsel shall be appointed at the preliminary hearing for each parent, guardian, and child in accordance with the provisions of [S.J.C. Rule 3:10, as appearing in 416 Mass. 1306 (1993)]. In the event that a party is not present at the preliminary hearing, counsel

shall nevertheless be appointed pending a determination of indigence. Counsel may be appointed for a parent whose identity is unknown, if the court deems such appointment appropriate." S.C. contends that the second sentence of this provision requires Juvenile Court judges, "*without discretion*, and *without* any regard to 'notice', and *without* any requirement that a parent show up in Court, to appoint counsel in *all* cases for *all* identified parents" (emphasis original). There are two problems with this argument. First, the fact that a parent is not present at a preliminary hearing does not necessarily excuse the parent's obligation to file an initial appearance or an objection to the petition. Second, S.C. fails to construe the second sentence of the provision in harmony with the first sentence, which requires that the appointment of counsel be "in accordance with the provisions of SJC Rule 3:10." Rule 3:10 (2) requires, among other considerations, that a party make some appearance before the court in order to be advised of the right to counsel. Thus, when a parent has made no appearance at all, counsel need not be appointed. Cf. *Care & Protection of Marina*, 424 Mass. 1003 (1997) (appearance of father's counsel properly struck when father abandoned participation in proceedings regarding children's care and protection and termination of parental rights). Acceptance of S.C.'s argument would lead to the incongruous result of counsel's being appointed to represent a parent who has not shown indigency, and counsel's then being required to represent someone with whom counsel has not consulted and whose position on the merits of the proceedings is unknown.[8] A lawyer cannot assume that an absent parent would want to contest the proceedings.

---

[8]We note that the second sentence of standing order 1-93 (4), stating, "In the event that a party is not present at the preliminary hearing, counsel shall nevertheless be appointed pending a determination of indigence," appears to conflict with G. L. c. 119, § 29 (counsel appointed if parent is financially unable to retain counsel), and S.J.C. Rule 3:10 (2), as appearing in 416 Mass. 1306 (1993) (counsel provided after court finds that party cannot afford counsel), in that the standing order provision does not require a parent to demonstrate indigence prior to the appointment of counsel. We shall refer this apparent conflict to the rules committee of this court. The committee should examine the matter in light of the cited references, and in light of the practice in the Probate and Family Court concerning the appointment of counsel for an indigent parent in similar proceedings, and the considerations set forth in the concurring opinion. *Post* at 691-692. The committee is to consult with the trial court departments that are affected and any other interested parties or groups. Thereafter, the committee shall take such action as it deems appropriate.

3. K.L. argues that the ineffectiveness of his trial counsel requires a new trial because his counsel failed to (1) investigate adequately the basis of L.A.'s testimony; (2) act as a zealous advocate; (3) make timely objections to hearsay; and (4) object to the admission of documents containing hearsay. We assess these contentions under the standard set forth in *Commonwealth v. Saferian*, 366 Mass. 89, 96 (1974), looking first to determine whether the "behavior of counsel [fell] measurably below that which might be expected from an ordinary fallible lawyer," and, if so, then "whether [counsel's conduct] has likely deprived [K.L.] of an otherwise available, substantial ground of defence." See *Adoption of Mary*, 414 Mass. 705, 712-713 (1993); *Care & Protection of Stephen*, 401 Mass. 144, 149 (1987) (adopting *Saferian* standard to evaluate such claims in care and protection proceedings). K.L. has failed to demonstrate that his counsel's representation deprived him of a "substantial ground of defence," or otherwise caused him prejudice. See *Commonwealth v. Saferian, supra*.

K.L. claims that he is relieved from the obligation to prove prejudice where his trial counsel's ineffectiveness was so pervasive that the result of the trial is "presumptively unreliable." See *Commonwealth v. Saferian, supra* at 96, 98 n.14. K.L.'s trial counsel's performance was adequate considering the situation with which he was presented. Trial counsel endeavored to cast L.A. as the abuser, to show that K.L. had not abused the children and was in fact a fit parent, and to otherwise protect K.L.'s interests. Throughout the trial, as the judge found, K.L.'s counsel made certain choices that were reasonable tactical choices.

More decisive of K.L.'s claim, however, is the fact that his parental unfitness was established by overwhelming evidence. K.L.'s claim that further efforts by his trial counsel could have produced a different result has no basis in the record. See *Commonwealth v. Salcedo*, 405 Mass. 346, 350-351 (1989). The evidence indicated that K.L. had little insight into his children or their problems, and that he was unable to articulate any concrete plans for caring for them. He expressed no desire to work, and articulated no plan for financially supporting his children. K.L. admitted to hitting both L.A. and the children, and acknowledged considerable abuse of L.A. Further, K.L. does not challenge the other findings made by the judge that detail his abuse of the children; his failure meaningfully to

engage in services offered by the department to help him become a fit parent; the fact that he failed, in many meetings with social workers, to express any interest in the children; and that his own testimony was contradictory and "seriously lacking in credibility." None of the materials advanced by K.L. in support of his motion for a new trial contravenes, in any meaningful way, the judge's conclusion that the best interests of the children are served by their placement in the adoptive home arranged by the department.

The judge did not consider the affidavits filed in support of K.L.'s motion for a new trial of sufficient weight or credibility substantially to undermine his findings and conclusions. As has been stated, the evidence of K.L.'s parental unfitness was overwhelming. In view of these considerations, we reject K.L.'s last contention that a "mistake" may have been made when the judge decided that the best interests of the children called for their adoption. See *Adoption of Frederick*, 405 Mass. 1, 8 (1989).

4. The decrees dispensing with each father's consent to the adoption of his children are affirmed. The orders denying the motions for a new trial are affirmed.

*So ordered.*

IRELAND, J. (concurring). While I agree with the conclusion reached today, I disagree with the majority's assessment of Standing Order 1-93 (4) of the Juvenile Court. *Ante* at 688-689. Because I believe that standing order 1-93 (4) makes sense, I write separately. The order states: "In *every* care and protection case counsel shall be appointed at the preliminary hearing for each parent, guardian, and child in accordance with the provisions of SJC Rule 3:10. In the event that a party is not present at the preliminary hearing, counsel shall nevertheless be appointed pending a determination of indigence. Counsel may be appointed for a parent whose identity is unknown, if the court deems such appointment appropriate." (Emphasis added.) This order properly emphasizes the importance of representing the interests of the absent parent. Among other things, appointed counsel could undertake a due diligent search for the parent and help ensure that the absent parent is included in the department's treatment plan. A private attorney appointed to represent the

interests of an absent parent may obtain information from family members that neither a DSS attorney nor a court-appointed investigator could — both because the family may be more forthcoming and because appointed counsel may not be viewed as the "enemy" or an adversary.

In my opinion, the rationale for appointing counsel at this stage of the proceedings is sound and makes common sense. It obviates any unnecessary delay that might occur if the absent parent later appears with a valid explanation for not having attended the preliminary hearing and wishes to participate in the case and, by extension, the child's life. The Juvenile Court would then be in the awkward position of having to start the case over — to arrange an investigation, treatment plan, clinic referral, and, perhaps, visitation for the now present parent, all of which could take months. Because such delays often result in significant hardship for the child, the appointment of counsel at the preliminary hearing is a particularly beneficial safeguard. *Custody of a Minor*, 389 Mass. 755, 764 (1983) ("Unless proceedings involving the custody of a minor are expedited, they fail to accomplish their purpose. . . . Prompt resolution of [such] issues is essential").

Parenthetically, I would add that standing order 1-93 could be improved by requiring counsel who has been appointed to represent an absent parent to withdraw if, after making a due diligent search, counsel is unable to locate the parent.