COMMONWEALTH *vs.* VINCENT GODWIN.

No. 02-P-1106.

Middlesex. October 3, 2003. - March 15, 2004.

Present: RAPOZA, GRASSO, & KANTROWITZ, JJ.

*Practice, Criminal,* Assistance of counsel. *Constitutional Law,* Assistance of counsel.

Discussion of the law regarding indigence as it relates to the right to court-appointed counsel. [608-610]
This court concluded that the burden is on a criminal defendant to demonstrate that his financial situation prevents him from securing counsel [610-611], and therefore, a trial judge properly ruled that a defendant who did not show he was indigent was not entitled to court-appointed counsel [611-614].

INDICTMENTS found and returned in the Superior Court Department on October 18, 2001.

Following a determination of nonindigency by *Charles J. Hely,* J., the cases were tried before *E. Susan Garsh,* J.

*Thomas C. Foley* for the defendant.

*Marguerite T. Grant,* Assistant District Attorney (*Lincoln S. Jalelian,* Assistant District Attorney, with her) for the Commonwealth.

KANTROWITZ, J. The defendant appeals from his convictions on the sole basis that he was deprived of his right to court-appointed counsel, which raises the issue: What showing must a criminal defendant, who claims to be indigent, make to ensure that he receives court-appointed counsel? We hold that the defendant bears the burden of demonstrating that he is indigent and entitled to court-appointed counsel. Because our review of the record reveals that the defendant, an experienced criminal trial attorney from Virginia, did not meet this burden, we affirm the judgments.

*Background.* In October, 2001, the defendant was charged with seven counts of larceny, totaling $245,600, from the Framingham Cooperative Bank (FCB), two counts of forgery, and two counts of uttering. A jury found him guilty of the seven larceny charges and acquitted him of the forgery and uttering counts. At issue is whether he was entitled to a court-appointed attorney, which had been denied him.[1]

*Factual summary.* From the evidence presented at trial, the jury could have found the following facts. On May 25, 2001, a check in the amount of $98,000, drawn on the account of the Madison Area Educational Special Services Unit, was deposited into a checking account the defendant held jointly with his wife at FCB. The check had not been validly issued by the named maker. On June 4, 2001, the defendant had $70,000 wired from his account to an entity called "K-R, Ltd.," which did its banking in New York; this money was then wired to Nigeria. Over the course of the next eleven days, the defendant withdrew varying amounts — $10,500, $7,400, and $2,500 — from his account. He also wrote a check for $1,200 to a Carol Davis and used a check for $4,000 to obtain a treasurer's check in the same amount for a local jewelry store.

On June 18, 2001, another unauthorized check, this time in the amount of $175,000, drawn from a Spelman College account, was deposited into the defendant's account. Three days later, the defendant had $150,000 wired from his account to "Klen-Riches Limited," and then to Nigeria.

After the payor banks returned the two unauthorized checks to FCB, FCB commenced an investigation and alerted the Framingham police department to the defendant's suspicious banking transactions.[2] During an interview with a police detective investigating the case, the defendant explained that, although he was surprised the money had been deposited into his account via check, he was not surprised that money had

---

[1]Postconviction, the defendant was appointed an attorney to pursue his appeal. We take no position on the propriety of this appointment.

[2]FCB was able to avoid the permanent loss of any funds because the payor bank of the $98,000 check honored the unauthorized check, and the $150,000 wire transfer was returned. Thus, only the payor bank of the $98,000 check permanently lost money.

been deposited; specifically, he had been expecting a wire transfer. He told the detective that an anonymous "good Samaritan" had come to his aid. The defendant claimed that this Samaritan, whom he refused to name, had pledged assistance in helping him recoup some money he had lost in a Nigerian oil deal gone sour and had told him to expect a wire deposit to his account. Showing good faith to his unnamed benefactor, the defendant purchased a Rolex watch for $5,000 and sent it to him in Nigeria.

*Indigency hearings.* At his arraignment on November 7, 2001, the defendant's indigency report, which had been completed by the probation department, was submitted to the judge for review. The report disclosed that the defendant was a forty-four year old lawyer who, although currently unemployed, had practiced law in Virginia for the past eleven years.[3] He reported that he had no income, no assets, no expenses, and was living with his aunt in Fitchburg. At his arraignment, the defendant commented that he had been considering the possibility of representing himself, but had not made a final decision. Upon an examination of the report and a short inquiry of the defendant,[4] the judge indicated that he would "stick with the court-appointed attorney" that had been assigned by the District Court, but indicated that if, after consulting with that attorney the defendant wanted to represent himself, that decision could be discussed at the next hearing.

One week later, at the pretrial conference before the same judge who had arraigned him, the issue of the defendant's indigency was again discussed. On that date, the court-appointed attorney was not present and, through the district attorney, was requesting a continuance of the pretrial conference. The defendant was present and eager that the pretrial conference proceed immediately. The defendant offered to represent himself

---

[3]At the pretrial status hearing, the defendant told the court that for the past nine years he had his own general law practice in Virginia. He stated more than one-half of his practice was devoted to criminal defense work and that over the years he had tried thousands of cases, of which forty to fifty felony trials were before a jury.

[4]When asked by the court if he owned a home, the defendant responded, "No, your Honor. I'm from Virginia." He further indicated that he was not paying rent at his aunt's home and that he had "worked most of this year."

at the pretrial conference so that it could go forward. At this point, the judge invited the defendant "to tell me anything which you think makes you qualify for indigency." The defendant did not offer any proof or explanation as to why he believed he was indigent. He responded only that "[he knew his] status. And like, being in this situation here, in Massachusetts, and away from my home in Virginia, I don't have anything here. But that doesn't mean that I am not prepared to go forward with this domicile." At that point, the judge found that the defendant was not indigent and the case was scheduled for trial.[5]

On February 20, 2002, six days prior to trial, the judge assigned to hear the case (trial judge) conducted a pretrial status hearing to review potential trial issues. During the hearing, the defendant objected to going forward without counsel and to the finding that he was not indigent. The trial judge asked whether he had appealed from the nonindigency determination, to which the defendant responded, "I didn't appeal, I just wanted the objection noted for the record that I just — I don't have anything and — that's all I told the Court." He did not offer any additional information to support his claim of indigency. The trial judge noted that no appeal had been taken from the determination that the defendant was not indigent and declined to disturb the finding of nonindigency.[6] The defendant proceeded to represent himself at trial.

*The law.* An indigent defendant is entitled to court-appointed

---

[5]The judge would have been well advised either to make written findings or to state on the record the reasons for his determination. Alternatively, the judge could have requested that the probation department make additional inquiries concerning the defendant's status.

[6]In a case where, as here, there has been a determination that the defendant is not entitled to court-appointed counsel, and where the defendant then does not secure counsel at his own expense, the effect is tantamount to a waiver of the right to be represented by counsel. See *Commonwealth* v. *Delorey*, 369 Mass. 323, 330 (1975) ("the legal effect of what occurred in this case is that the defendant intentionally and knowingly waived his constitutional right to be represented by counsel"). The trial judge here found such a waiver. In these circumstances, however, where the defendant continued to maintain that he was entitled to court-appointed counsel and where the extent of any previous inquiry concerning his financial status was not clear from the record, the better practice would have been to inquire further about the defendant's financial status. In view of our holding that the defendant had the burden of

counsel. *Gideon* v. *Wainwright,* 372 U.S. 335 (1963). "This right is protected by the Sixth Amendment to the United States Constitution (see *Argersinger* v. *Hamlin,* 407 U.S. 25 [1972]), by art. 12 of the Declaration of Rights of the Massachusetts Constitution, and by S.J.C. Rule 3:10, as amended, 399 Mass. 1207 (1987)." *Commonwealth* v. *Babb,* 416 Mass. 732, 735 (1994). The deprivation of the right to counsel results in automatic reversal of a conviction, without determination whether the defendant was prejudiced by the deprivation. It is "[a] structural error . . . that so infringes on a defendant's right to the basic components of a fair trial that it can never be considered harmless." *Commonwealth* v. *Villanueva,* 47 Mass. App. Ct. 905, 906 (1999). See *Commonwealth* v. *Curtis,* 417 Mass. 619, 635-636 (1994).

Indigence is determined through the confluence of Mass.R. Crim.P. 8, as amended, 397 Mass. 1226 (1986) (which directs the District and Superior Courts to follow the procedures for assignment of counsel established in G. L. c. 211D[7]), and S.J.C. Rule 3:10, as amended, 416 Mass. 1306 (1993). See Mass.R. Crim.P. 33, as amended, 397 Mass. 1227 (1986). Rule 3:10, § 4(a), in pertinent part, defines an indigent party as one who is "receiving an annual income, after taxes, 125% or less of the current poverty threshold referred to in G. L. c. 261, § 27A(*b*)." A judge may avoid a strict application of the definitions in rule 3:10, § 4(a), "based on a consideration of the party's available funds in relation to the party's basic living costs or based on special circumstances, or both, provided that the judge sets forth

establishing his indigency, which he did not meet, any such omission is without consequence.

[7]General Laws c. 211D, § 5, as inserted by St. 1983, c. 673, § 2, states, in pertinent part, "A justice or associate justice shall assign a case to the [Committee for Public Counsel Services], . . . after receiving from the probation officer a written report containing the probation officer's opinion as to the defendant's ability to pay for counsel, based on the standards and procedures provided for in section two."

In turn, G. L. c. 211D, § 2, as inserted by St. 1983, c. 673, § 1, provides that in formulating the "definition [of indigency], standards, and procedures, the committee shall consider the reporting system operated by the commissioner of revenue for the purpose of verifying financial eligibility of participants in state or federally funded programs, and its potential applicability to the provision of legal services for indigent defendants."

in findings on the record the reasons for doing so." S.J.C. Rule 3:10, § 4(b). Cf. G. L. c. 261 § 27C(3).[8]

Usually the determination of indigency is relatively simple, and a defendant who comes within the definition is routinely provided counsel. There are occasions, however, where the evidence is murky, and the determination neither straightforward nor obvious. Although the applicable rules do not assign the burden of proof in controversies surrounding a defendant's indigency, we hold that the burden is on a defendant to show that his financial situation prevents him from securing counsel.

In *Adoption of Holly*, 432 Mass. 680, 688 (2000), the Supreme Judicial Court held, in interpreting G. L. c. 119, § 29,[9] that it was "obvious from [the] statutory language that a parent must first demonstrate indigency before counsel is appointed." See *Adoption of Olivia*, 53 Mass. App. Ct. 670, 673-675 & nn. 3-4 (2002). Significantly, the statutory language considered by the court in *Holly* was no more specific in assigning the burden than is the language in rule 3:10 pertaining to a criminal defendant.

Moreover, a line of Federal cases is in accord with placing the burden of proof of indigency on the defendant. See *United States* v. *Harris*, 707 F.2d 653, 660 (2d Cir.), cert. denied, 464 U.S. 997 (1983) ("the weight of authority is that the burden [to

---

[8]General Laws c. 261, § 27C(3), as appearing in St. 1980, c. 539, § 7, although discussing court costs and fees, and not attorney's fees, is applicable to criminal cases and requires that "before making a finding of indigency, the court shall consider the following facts with respect to the applicant as of the time of the hearing, in the immediate past and with respect to the immediate future; his age, education, training, physical and mental ability and number of dependents; gross and net income; regular and extraordinary expense, if any; assets and liabilities; whether or not he is a recipient of public assistance and for what purposes; and any other facts which are relevant to the applicant's ability to pay court costs." G. L. c. 261 § 27C(3). Notably, G. L. c. 261, § 27C, is specifically mentioned in the Reporters' Notes to Mass.R.Crim.P. 33, Mass. Ann. Laws, Rules of Criminal Procedure, at 479 (West 2002), which also refer to Mass.R.Crim.P. 8, as amended, 397 Mass. 1226 (1986).

[9]"The parent . . . of such child shall have and shall be informed of the right to counsel at all hearings under said sections and in any other proceeding regarding child custody where the department of social services . . . is a party . . . and if said parent . . . is financially unable to retain counsel . . . the court shall appoint counsel for said parent. . . ." *Adoption of Holly*, 432 Mass. 680, 688 (2000), quoting from G. L. c. 119, § 29.

prove indigency] rests with the defendant"); *United States* v. *Santiago-Fraticelli*, 818 F. Supp. 27, 29-30 (D. P.R. 1993) ("a line of circuit cases beginning with *United States* v. *Harris* . . . has clearly put the burden of proof on defendants to show that their financial situation prevents them from securing adequate counsel"); *United States* v. *Salemme*, 985 F. Supp. 197, 201 (D. Mass. 1997).

Finally, our conclusion is buttressed by the simple logic that it is the defendant who is most knowledgeable of his own financial status. To place the burden on the Commonwealth would promote inefficiency and could open the door to evasiveness and manipulation of the court-appointment system by non-indigent defendants.

During a hearing on indigency, a judge is warranted, as in any hearing where evidence or information is presented, to make credibility determinations. See, e.g., *Commonwealth* v. *Costa*, 414 Mass. 618, 626 (1993) (determination of the weight and credibility of the testimony is the function and responsibility of the judge who saw the witness). Consequently, a judge need not credit a defendant's unsupported claim of indigency. Before the limited funds of the Commonwealth are expended, the defendant should be required to say more than, in essence, "I'm broke, I need an attorney." While a judge may accept such an unadorned statement, judges are encouraged to require that a defendant substantiate his assertion in some meaningful fashion.

*The present case.* Here, the defendant argues that he was unjustifiably deprived of his constitutional right to counsel when the trial court found he was not indigent. We do not agree. The judge's determination is supported by the record for the following reasons.[10]

The defendant's indigency report filed with the probation department lacks credibility. Although the judge who initially

---

[10]In an attempt to bolster his claim of indigency, the defendant includes in his record appendix documents that he filed months after the judge found that he was not indigent. These additional documents consist of nothing more than a motion for appointment of appellate counsel, and an accompanying affidavit of indigency and supplement thereto. The documents do nothing to demonstrate the defendant was indigent at the time of trial. See note 1, *supra*.

denied the defendant court-appointed counsel did not specifi-
cally make findings on the issue of the defendant's credibility,
we can infer that he found the defendant not to be credible. See,
e.g., *Commonwealth* v. *Myers,* 16 Mass. App. Ct. 554, 555
(1983). The defendant's assertion that he had been an attorney
for the past eleven years and had "worked most of this year,"
yet did not have a single cent nor any assets to his name strains
credulity. His sudden indigency is further questionable in that
he reported having three dependents yet failed to itemize a
single expense associated with supporting them. His failure to
claim expenses for such basic necessities as food or transporta-
tion indicates the cavalier and disingenuous manner in which he
supplied information for this document. Moreover, although the
defendant asserted he was not employed and had no assets, his
wife was employed (though the defendant and his wife were
living separately), and the defendant had held the checking ac-
count jointly with his wife. We do not suggest all of the marital
funds should have been appropriated to pay for the defendant's
attorney, but the defendant's failure to shed any light on the
disappearance of such funds is further evidence of his lack of
candor before the court.[11]

We note the defendant's training as a lawyer provided him
with the ability to understand the proceedings, their implica-
tions, and the specific questions posed to him. Despite this
background, the defendant failed to answer directly many of the
judges' questions posed over the course of three hearings and
failed adequately to fill out the indigency form. Where the
burden of demonstrating indigency falls on the defendant, as we
hold it does, a defendant may properly be required to do more
than supply inaccurate and misleading information for a form
he knows will be used to determine his right to court-appointed
counsel. The same requirement applies with respect to a
defendant's statements to a judge. While the judges here should
have made further inquiries of the defendant and articulated
their findings, S.J.C. Rule 3:10(4)(b), the failure to have done
so does not prohibit our evaluation of the record.

The defendant's failure to seek reconsideration of the

---

[11]At no time did the defendant suggest his lack of candor may have been
borne of a desire not to incriminate himself.

determination that he was not indigent bolsters our conclusion that the judge properly denied appointed counsel. See S.J.C. Rule 3:10(7)(b) ("A party has the right to reconsideration in a formal hearing"). Here, the trial judge asked the defendant if he had appealed the court's finding that he was not indigent. The defendant responded that he had not appealed and merely wanted the objection noted for the record. Had the defendant been truly aggrieved by the failure to appoint counsel or by the determination that he was not indigent, he had the opportunity to seek reconsideration of this ruling. Such further consideration would have given the defendant an additional opportunity to present whatever documentary evidence or testimony (e.g., from his wife or aunt) may have supported his claim. See also S.J.C. Rule 7(a).

Finally, although the judge did not have this information before him when making the initial determination, there is little question the defendant had funds available to him. Prior to his arrest, he wrote a check to himself, on June 4, 2001, in the amount of $10,500, and promptly cashed it. He did the same with checks for $7,400, on June 5, 2001, and $2,500, on June 12, 2001. On June 9, 2001, the defendant also wrote a check in the amount of $1,200 to a Carol Davis, who cashed the check. The defendant obtained a treasurer's check on June 13, 2001, in the amount of $4,000, using money from his checking account, and payable to a local jewelry store.[12] (On June 4, 2001, the defendant also wired $70,000 to K-R Ltd., using funds from the checking account.)[13] The defendant indicated that he was not paying rent at his aunt's home and that he had "worked most of this year."

The defendant did not meet his burden of demonstrating that he was indigent. In view of all the circumstances presented in this case, the record supports the judge's ruling that the defendant was not entitled to court-appointed counsel. See *Com-*

---

[12]Interestingly, the watch the defendant purchased at the jewelry store cost $5,000. The treasurer's check, as we have stated, was in the amount of $4,000, inferably leaving the defendant to pay the remaining $1,000.

[13]Shortly before the defendant's arrest, an additional withdrawal of $250 was made on the account. The day of the defendant's arrest, two more withdrawals of $300 and $500 were made. Four days later, a final withdrawal of $124.26 was made, and the account was closed.

*monwealth* v. *Delorey*, 369 Mass. 323, 330 (1975) ("We do not substitute our judgment for that of the trial judge on the factual issue whether the defendant was able to pay for counsel").

*Judgments affirmed.*