# FOR PUBLICATION



ATTORNEYS FOR APPELLANT:

**ALISON L. BENJAMIN**
**JAMES N. THIROS**
Thiros & Stracci, P.C.
Merrillville, Indiana

ATTORNEYS FOR APPELLEE:

**GREGORY F. ZOELLER**
Attorney General of Indiana

**CHANDRA K. HEIN**
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | | |
|---|---|---|
| TIMOTHY W. PARISH, | ) | |
| | ) | |
| Appellant-Defendant, | ) | |
| | ) | |
| vs. | ) | No. 64A03-1210-CR-438 |
| | ) | |
| STATE OF INDIANA, | ) | |
| | ) | |
| Appellee-Plaintiff. | ) | |

APPEAL FROM THE PORTER SUPERIOR COURT
The Honorable Jeffrey L. Thode, Judge
Cause No. 64D06-1107-FD-6361

**June 27, 2013**

**OPINION - FOR PUBLICATION**

**VAIDIK, Judge**

**Case Summary**

Timothy W. Parish represented himself at trial and was convicted of two counts of Class D felony strangulation and one count of Class D felony domestic battery. Parish now appeals arguing that the trial court abused its discretion in denying him counsel at public expense and that he did not knowingly, intelligently, and voluntarily waive his right to counsel. We find that the trial court properly denied Parish's request for counsel at public expense because he had $130,000 in equity in his house. However, we find that the facts and circumstances of this case do not warrant a knowing and intelligent waiver of Parish's right to counsel because the trial court did not advise him of the dangers and disadvantages of self-representation. We therefore reverse and remand for a new trial.

**Facts and Procedural History**

In July 2011, R.S. and her nine-year-old son B.H. lived with twenty-five-year-old Parish and his mother in Portage, Indiana. R.S. and Parish were engaged. On the evening of July 10, B.H. was in his room when R.S. and Parish began arguing. After a few minutes, B.H. went downstairs and saw Parish choking his mother. When Parish pinned R.S. against the wall, B.H. kicked Parish in the groin. As B.H. ran away, Parish grabbed him and choked him to the point that he "couldn't breathe that much." 5-22-12 Tr. p. 29. B.H. eventually escaped to a neighbor's house, and the neighbor called 911. When police arrived, R.S. told them that Parish had punched her all over, causing her pain. The police observed scratches on R.S.'s neck. However, R.S. requested that charges not be filed because she and B.H. needed a place to stay.

2

On July 11, the State charged Parish with two counts of Class D felony strangulation (one for R.S. and one for B.H.) and one count of Class D felony domestic battery related to R.S., which had been elevated to a felony because it was committed in the presence of a child less than sixteen years old.

On July 12, the trial court held an initial hearing on Parish's charges and informed him of his right to counsel:

> Your rights are granted to you by the Indiana [C]onstitution as well as the Constitution of the United States, and you do have the right to be represented by an attorney in this case. You may hire your own attorney if you choose. If you are indigent you may have an attorney assigned to represent you at little or no cost.

7-12-2011 Tr. p. 4. After advising Parish of his other rights, the trial court set Parish's bond "at $3000 surety, which is $300 to a bondsman" or "$1000 in cash" and entered a no-contact order which prohibited Parish from having contact with either R.S. or B.H. *Id.* at 8. Parish posted a surety bond of $300 through a bondsperson later that day.

The trial court held an omnibus hearing on September 8. The trial court asked Parish if he intended to maintain his not-guilty plea, and Parish said yes. 9-8-11 Tr. p. 3. The court then asked Parish if he planned to hire a lawyer, and Parish said no. *Id.* When the court asked Parish if he was going to represent himself, Parish said yes. *Id.* Notably, the court made no further inquiry into Parish's decision to represent himself. The court confirmed that the pretrial conference was set for December 2 and the jury trial was set for January 10, and the hearing ended. *Id.*

The pretrial conference was held on December 2, at which time the trial court asked Parish if he expected to proceed to trial on January 10. Parish said yes. When the

3

court asked Parish if he was still going to represent himself, Parish said, "I'd like to see if I can get a public defender." 12-2-11 Tr. p. 3. The trial court then placed Parish under oath in order to inquire into his financial status:

Q      Where do you live, Tim?
A      6676 Liberty Ave., Portage, Indiana.
Q      Do you live in a house, an apartment?
A      House.
Q      Who do you live with?
A      Um, my girlfriend and now my mom.
Q      And who's your girlfriend?
A      [R.S.].
Q      I beg your pardon?
A      [R.S.].
Q      Okay. Well, I'm not saying anything, Tim, but I'm just saying, you know, there's a no-contact order that you're not supposed to have any contact with [R.S.].
A      No, I don't live there—I'm not—
Q      Okay.
A      --staying there now. No, I know that.
Q      All right. So, where do you live?
A      Um, pretty much with the one buddy. I jump around from two houses—
Q      Okay.
A      --until they allow me back in my house.
Q      So, do you work?
A      Yes.
Q      Where do you work?
A      I do security out of Chicago.
Q      How much—how many hours a week do you work?
A      Uh, 50. About—give or take 50.
Q      What do you make per hour?
A      Um, 11—11 something an hour.
Q      What do you bring home every paycheck?
A      I wanna say—like I said, the hours, but give or take 600.
Q      Okay. And how many—is that every week?
A      Every other week.
Q      Every other week? You make 11 dollars an hour?
A      Yeah.
Q      And you work 50 hours every pay or every week?
A      Every week.
Q      Every week?

4

A      By the time they take taxes out, I don't know why but they take a lot of taxes out of my check.

Q      All right. What do you do with your money you bring home?

A      Bills.

Q      What do you pay?

A      Everything. I own—I own that house on Liberty Street.

Q      Okay. Do you make a mortgage payment on it?

A      No, I'm done paying it off.

Q      So you own it?

A      I own it.

Q      Okay. How much is it worth?

A      I would say 130.

Q      Okay, and you don't owe anything on it?

A      One thirty to 150. No.

Q      Well, you don't qualify for a public defender, Tim. You've got an asset of $130,000.

A      I tried.

Q      Good point.

*Id.* at 4-6. At the end of the pretrial conference, the trial court told Parish that "if you're planning to hire a lawyer, you might want to do that as soon as you can so they can get involved in this case." *Id.* at 6-7.

On January 4, 2012, the State filed a motion to continue the jury trial. The trial court granted the motion and reset the jury trial to April 10. On January 19, Parish filed a motion for a speedy trial because the case had been "going on for too long." Appellant's App. p. 32. Parish was specifically concerned about his house: "I own it and my name is the only one on the deed and for some reason I'm the only one not allowed in the house. I'm struggling to pay the bills and live in another house." *Id.* The State filed another motion to continue the trial, and the trial was reset to May 22.

A jury trial was held on May 22, and Parish represented himself. B.H. did not testify. R.S. testified, but she said that if she had her choice, she would still be living with Parish and the charges would never have been filed in the first place. R.H. also

5

denied telling the police that Parish hit her, and she said that their fight was verbal only. The jury found Parish guilty of all three counts.

On June 7, private counsel entered an appearance on behalf of Parish. Parish was sentenced on September 27 to concurrent terms of three years, with six months served in the Porter County Jail and the remainder suspended to probation.

Parish now appeals.

## Discussion and Decision

Parish raises two issues on appeal. First, Parish contends that the trial court abused its discretion in denying him counsel at public expense. Second, Parish contends that he did not knowingly, intelligently, and voluntarily waive his right to counsel.[1]

## I. Right to Appointed Counsel at Public Expense

Parish contends that the trial court abused its discretion in denying him counsel at public expense. It is within the trial court's discretion to determine whether counsel shall

---

[1] Although not raised as a separate issue, Parish points out several instances of vouching at trial, which he did not object to. For example, B.H. did not testify at trial. But Corporal Lisa Duncan did. The prosecutor questioned Corporal Duncan as follows:

> Q Uh, Corporal Duncan, in your off-duty life you have several children?
> A I do, three boys.
> Q So beyond your professional training you do have extensive personal experience dealing with young children, especially boys, and observing how they act in response to emotional situations?
> A Yes, I do.
> Q In your training and experience did you feel that [B.H.]'s reactions were genuine, or at some point did you come to suspect that he was exaggerating or lying about what happened that night?
> A No, I completely believed him. I—There's no way he would have been faking the nervousness that he was displaying or eyes darting around the room, the shakiness in his voice. He was genuinely scared.

5-22-12 Tr. p. 27. Corporal Duncan also spoke with the neighbor who called 911. Corporal Duncan testified that the neighbor told her that B.H. was "a good kid" and "she believed what he was saying. He appeared truthful." *Id.* at 29; *see also id.* at 30 ("Q Did you feel he was exaggerating what had happened . . . ? A No, no. He appeared truthful."). On retrial, we caution against such vouching, which was exacerbated by the fact that B.H. did not testify at trial.

be appointed at public expense. *Shively v. State*, 912 N.E.2d 427, 430 (Ind. Ct. App. 2009). The court does not, however, have discretion to deny counsel to an indigent defendant. *Id.* The court's duty to appoint competent counsel arises at any stage of the proceedings when the defendant's indigency causes him to be without the assistance of counsel. *Id.* A failure to permit a defendant to have counsel amounts to a denial of due process, and there can be no valid criminal trial unless a defendant is represented by counsel if he desires representation. *Id.* There is no set specific financial guideline for the determination of indigency. *Id.* It is clear, however, that a defendant does not have to be totally without means in order to be entitled to counsel at public expense. *Id.* Counsel must be appointed if a defendant cannot employ an attorney without imposing substantial hardship on himself or his family. *Id.* The fact that a defendant is able to post a bail bond is a factor to be considered but is not sufficient in itself to preclude a defendant from being found to be indigent. *See Graves v. State*, 503 N.E.2d 1258, 1262 (Ind. Ct. App. 1987). An indigency determination cannot be made "on a superficial examination of income and ownership of property but must be based on as thorough an examination of the defendant's total financial picture as is practical." *Shively*, 912 N.E.2d at 430-31 (quotation omitted). A determination of ability to pay must include a balancing of assets against liabilities and a consideration of the amount of the defendant's disposable income or other resources reasonably available to him after the payment of fixed or certain obligations. *Id.* at 431. Moreover, because the right to counsel is a fundamental constitutional right, the record in each case must show that careful consideration of indigency, commensurate with the right at stake, has been given to the defendant. *Id.*

Parish argues that the trial court abused its discretion because it failed to consider his "complete financial picture." Appellant's Br. p. 20. Parish concedes that the trial court inquired about where he lived, who he lived with, where he worked, how much he earned per paycheck, what he did with the money he brought home, and how much equity he had in his home. However, Parish claims that the trial court failed to inquire into his monthly expenses, such as food, clothing, transportation, utilities, and medical/dental expenses. When the trial court asked Parish what he did with the money he brought home, Parish responded, "Bills." And when the court followed up by asking what he paid, Parish generically responded, "Everything." The trial court's inquiry into Parish's monthly expenses was sidetracked when Parish told the court that he owned his home free and clear of any mortgage. When the trial court asked Parish how much his home was worth, Parish said $130,000-$150,000. At this point, the trial court told Parish that he did not qualify for a public defender, to which Parish cutely responded, "I tried."

Here, the record shows that Parish had substantial equity in his home and despite the opportunity to list his monthly bills Parish did not do so. Parish also posted bond on the same day that the trial court set it and obtained an attorney to represent him at sentencing without any financial assistance from the court.[2] Parish should have been required to use the equity in his home before being appointed counsel at public expense. Accordingly, the trial court properly denied Parish's request for counsel at public expense. *See Redmond v. State*, 518 N.E.2d 1095, 1096 (Ind. 1988) (distinguishing facts

---

[2] Parish makes a passing remark that he had to maintain two residences because of the no-contact order. At a pretrial conference, Parish said that he mainly lived with one buddy but would jump around between two houses. However, Parish never presented any evidence that he was required to pay rent or incurred further debt as a result of these living arrangements.

in *Redmond* from facts in *Moore v. State*, 401 N.E.2d 676 (1980), where the defendant had equity in real estate as well as equipment in a well-drilling business, and the dissent found that the defendant should be required to make use of those assets before being appointed pauper counsel; the defendant in *Redmond* had no such assets).

## II. Waiver of Right to Counsel

Parish next contends that he did not knowingly, intelligently, and voluntarily waive his right to counsel. The Sixth Amendment, applicable to the states through the Fourteenth Amendment, guarantees a criminal defendant the right to counsel before he may be tried, convicted, and punished. *Hopper v. State*, 957 N.E.2d 613, 617 (Ind. 2011) (citing *Faretta v. California*, 422 U.S. 806, 807 (1975)). This protection also encompasses an affirmative right for a defendant to represent himself in a criminal case. *Id.* However, "'[i]t is undeniable that in most criminal prosecutions defendants could better defend with counsel's guidance than by their own unskilled efforts.'" *Id.* at 617-18 (quoting *Faretta*, 422 U.S. at 834). The defendant who waives his right to counsel and proceeds to trial unrepresented is forgoing "many of the traditional benefits associated with the right to counsel," and in order to represent himself the accused must "knowingly and intelligently forgo those relinquished benefits." *Faretta*, 422 U.S. at 835. "[H]e should be made aware of the dangers and disadvantages of self-representation, so that the record will establish that 'he knows what he is doing and his choice is made with eyes open.'" *Id.* (quoting *Adams v. United States ex rel. McCann*, 317 U.S. 269, 279 (1942)).

There is no particular formula or script that must be read to the defendant. *Hopper*, 957 N.E.2d at 618. "The information that must be given 'will depend on a range

9

of case-specific factors, including the defendant's education or sophistication, the complex or easily grasped nature of the charge, and the stage of the proceeding.'" *Id.* (quoting *Iowa v. Tovar*, 541 U.S. 77, 88 (2004)).

Courts determining whether a waiver of counsel for trial was made voluntarily and intelligently must consider (1) the extent of the court's inquiry into the defendant's decision, (2) other evidence in the record that establishes whether the defendant understood the dangers and disadvantages of self-representation, (3) the background and experience of the defendant, and (4) the context of the defendant's decision to proceed pro se. *Id.* These factors are taken from case law from the Seventh Circuit, *see United States v. Hoskins*, 243 F.3d 407 (7th Cir. 2001), and applied to situations as diverse as trial for battery, *Poynter v. State*, 749 N.E.2d 1122 (Ind. 2001), and for capital murder, *Kubsch v. State*, 866 N.E.2d 726 (Ind. 2007), *reh'g denied*. *Hopper*, 957 N.E.2d at 618.

Here, the State concedes that the trial court did not advise Parish of the dangers and disadvantages of self-representation. Nevertheless, the State argues that Parish was independently aware of the dangers and disadvantages of self-representation.[3] Applying the first factor from *Hopper*, the trial court made no inquiry into Parish's decision to

---

[3] The State's argument is based on the sequence of events that after telling the trial court that he wanted to proceed pro se, Parish filed a motion for speedy trial. Then, after filing this motion, Parish requested a public defender. Thus, the State's argument continues, "It is reasonable to infer that after Parish attempted to proceed *pro se* by, for example, filing his Motion for a Speedy Trial and responding to the State's discovery request, he realized the dangers and disadvantages of proceeding *pro se* and then requested counsel." Appellee's Br. p. 12. The problem with the State's argument is that Parish told the trial court that he wanted to proceed pro se at the September 8, 2011, omnibus hearing but then changed his mind and requested a public defender at the December 2, 2011, pretrial conference. Parish did not file his motion for speedy trial until January 19, 2012, and the State did not request discovery from Parish until April 12, 2012—both dates well after Parish was denied a public defender. Thus, the timing does not support the State's argument, and we will not consider this argument.

10

proceed pro se. When Parish told the trial court that he was going to represent himself, the court did not ask any questions, and the hearing simply ended.

Applying the second factor—whether there is other evidence in the record that establishes that the defendant understood the dangers and disadvantages of self-representation—Parish was advised during his initial hearing of his right to an attorney. But other than this advisement—which was given to all the defendants present in the courtroom for their initial hearing—the trial court made only one other reference about Parish's "right" to counsel. That is, after Parish was denied a public defender at his pretrial conference, the trial court told him that "if you're planning to hire a lawyer, you might want to do that as soon as you can so they can get involved in this case." 12-2-12 Tr. p. 6-7.

As for the third factor, the record does not reveal the educational background and legal experience of Parish, who was twenty-five years old and employed at the time of the offenses in this case, because the trial court failed to conduct any inquiry. And because the record on appeal does not contain any information regarding Parish's sentence, we do not know whether he has a criminal history.

Finally, as for the context of Parish's decision to proceed pro se, it appears that Parish ultimately represented himself based on the trial court's denial of his request for a public defender.

When a defendant asserts the right of self-representation, the court should tell the defendant of the "dangers and disadvantages of self-representation." *Faretta*, 422 U.S. at 835. Here, as the State concedes, the trial court did not advise Parish of the dangers and

11

disadvantages of self-representation. This lack of advisement weighs heavily against finding a knowing and intelligent waiver. And the record does not demonstrate that Parish independently understood the dangers and disadvantages of self-representation. Although the trial court told Parish at his pretrial conference that if he was planning to hire a lawyer he should do so soon, this was not enough. The facts and circumstances of this case do not warrant a knowing and intelligent waiver. The importance of the right to counsel cautions that trial courts should at a minimum reasonably inform defendants of the dangers and disadvantages of proceeding without counsel. *Poynter*, 749 N.E.2d at 1128. That was not done here. Accordingly, the judgment is reversed, and this case is remanded for a new trial.

Affirmed in part, reversed in part, and remanded.

KIRSCH, J., and PYLE, J., concur.

12