2014 COA 80M

**The PEOPLE of the State of Colorado, Plaintiff–Appellee,**

v.

**Sanford B. SCHUPPER, Defendant–Appellant.**

**Court of Appeals No. 07CA1217**

Colorado Court of Appeals,
Div. IV.

Announced July 3, 2014

As Modified on Denial of Rehearing
July 17, 2014

El Paso County District Court No. 95CR3134, Honorable Larry E. Schwartz, Judge, Honorable Donald E. Campbell, Judge, Honorable David S. Prince, Judge

John W. Suthers, Attorney General, Majid Yazdi, Assistant Attorney General, Denver, Colorado, for Plaintiff–Appellee

Thomas K. Carberry, Denver, Colorado, for Defendant–Appellant

Opinion by JUDGE GRAHAM

¶ 1 Defendant, Sanford B. Schupper, appeals the judgment of conviction entered upon a jury verdict finding him guilty of theft. We affirm.

## I. Background

¶ 2 The history of this case is a long and tortured one. Because the history provides a factual basis necessary to place this matter in context, we include it here.

¶ 3 On September 7, 1995, defendant was charged with a single count of felony theft in El Paso County (95CR3134) ("theft case"). Initially, defendant requested court-appointed counsel, but later came to an agreement to pay counsel privately.[1]

¶ 4 In April 2001, defendant had yet to be tried. On April 6, defendant's private counsel requested to withdraw from the case based on defendant's failure to pay approximately $120,000 in legal fees. Judge Schwartz, sympathetic to counsel but frustrated by the delay in the case, denied the motion. Private counsel then filed several additional motions to withdraw, and eventually was permitted to withdraw on May 25, 2001, based on a conflict of interest with defendant.

¶ 5 On the same day that counsel argued his initial motion to withdraw, defendant completed Form JDF208 ("affidavit ") alleging that he was indigent and requesting court-appointed counsel. In his affidavit, defendant listed under monthly income "no salary paid since 12/15/00." Under assets, defendant listed $610 in savings, $5500 in

---

1. Defendant was charged in four additional cases: 95CR3008, 95CR3113, 96CR335, and 96CR1193, under the Colorado Organized Crime Control Act (COCCA) ("the COCCA cases"). In pertinent part, defendant was charged with racketeering, § 18–17–104, C.R.S.2013; theft, § 18–4–401(2)(d), C.R.S.2013; perjury, §§ 18–8–502(1) and 18–1–105(9.5), C.R.S.2013; attempt to influence a public servant, §§ 18–8–306, C.R.S.2013, and 18–1–105(9.5); and computer crime, § 18–5.5–102(1), C.R.S.2013. Several of these charges are addressed in separate opinions of this court. *See People v. Schupper*, 2013 WL 6512485 (Colo.App. No. 11 CA0321, Dec. 12, 2013) (not published pursuant to C.A.R. 35(f)); *People v. Schupper*, 2013 WL 3778778 (Colo.App. No. 05CA0764, July 18, 2013) (not published pursuant to C.A.R. 35(f)).

checking, and $5000 in personal property with nothing convertible to cash. Defendant listed $14,400 in monthly expenses and over $500,000 in "judgments."

¶ 6 Based on the affidavit, the public defender determined defendant was entitled to court-appointed counsel, and, on June 7, 2001, a public defender was appointed to represent defendant. Pursuant to statute, section 21–1–103(3), C.R.S.2013, the district attorney received a copy of defendant's affidavit. On June 13, 2001, the prosecution filed a "motion to challenge finding of indigency," arguing defendant had misrepresented his assets in the affidavit and that defendant was not entitled to court-appointed counsel. At a hearing on the People's motion, the court determined defendant should be appointed counsel to represent him at the indigency hearing.

¶ 7 On June 26, 2001, investigators executed a search warrant on defendant's residence and took photographic evidence of his assets. At a hearing two days later, the prosecution sought to introduce evidence from the search of defendant's home. The prosecution also subpoenaed private counsel's billing records to show the substantial funds defendant had paid counsel. Because private counsel objected to the subpoena on the grounds of attorney-client privilege, the court continued the hearing to allow the parties to brief the question of whether the billing records were privileged documents.

¶ 8 On July 30, 2001, a grand jury indicted defendant on a charge of perjury based on his affidavit (01CR2859). Consequently, the prosecution also charged defendant with violation of his bail bond in the theft and COCCA cases (01CR2889) (together with 01CR2859, the "perjury cases"). Defendant was arrested the next day, and the perjury cases were set before a different division than the theft and COCCA cases.[2]

¶ 9 On August 2, August 6, and August 13, 2001, the court held hearings on the appointment of alternate defense counsel for the limited purpose of representing defendant in his quest for court-appointed counsel as an indigent person.

¶ 10 The court held a bond hearing on the COCCA and perjury cases on August 16, 2001. At that hearing, the court made several findings of fact concerning defendant's assets. The court found that defendant had recently sold a piano for between $10,000 and $15,000; defendant had $80,000 in personal jewelry; defendant had an $11,000 cigar collection; and defendant had an exclusive wine collection. While alternate defense counsel was present at the hearing, the court continued the indigency determination so that the alternate defense counsel could fully prepare.

¶ 11 During the pendency of the indigency determination, the public defender's office was still representing defendant on the theft and COCCA cases. Trial on the theft case was scheduled to start on September 10, 2001. On that date, the trial court continued the case to provide the public defender with additional time to prepare. On the same day, the prosecution moved to add fourteen counts of check fraud related to the felony theft charge.

¶ 12 The court held additional hearings on defendant's indigency affidavit on September 19, October 10, October 29, November 19, and December 13, 2001. During that time, the court appointed a collections investigator to meet with defendant to determine his assets and liabilities for purposes of the indigency determination. The collections investigator recommended defendant be denied court-appointed counsel.

¶ 13 On December 19, 2001, the court held its final hearing on defendant's request for court-appointed counsel. After testimony from the collections investigator and a moving company employee hired by defendant to move items out of his home, the court concluded as follows:

> So the Defendant ... indicated at the time that he submitted his original application for court-appointed counsel that he had virtually no assets, as I understand his application, that he had no income....

2. In the end, the trial court granted defendant's motion for judgment of acquittal during the trial on the perjury cases. The court's ruling was disapproved in *People v. Schupper,* 140 P.3d 293 (Colo.App.2006).

[A]nd he has maintained that through [alternate defense counsel] up to the present. In fact, that was underlined by the accountant, who indicated, as I recall his testimony, that there was virtually no money left in any of the accounts.

Well, the Court will find to the contrary. That, first of all, there are substantial assets in existence. They are luxury assets. They still exist, as is testified to by the person who did the moving in this case, as well as the hearsay testimony given to us by the Defendant's either maid or housekeeper, whatever you call her. So the Court will find that there are substantially in excess of $10,000 in assets. They still exist. The Defendant still has access to them. And so to the extent that it affects the final numerical determination on the calculation chart, I agree with the collection investigator assessment, that he is entitled to no points as a result of that.

The second question is whether or not he has income that is in excess of the guidelines, noting that the guidelines, taking them in the light most favorable to Defendant, would allow him to have somewhere around $1200 in monthly income—and the evidence that's been presented today shows . . . the Court that he has had considerably more than that as recently as the last month . . . particularly for the type of expenses that are shown in the attachments which the collection investigator reviewed.

The Court will note there are approximately $5,000 of expenses—$4,700 is more accurate—that have been expended by the Defendant during the last month for what appear to be moving expenses. They're certainly not living expenses. They're not the type of expenses one would expect from indigent persons, and they far exceed anything the Court has reviewed in an indigency application in the past.

I assume that the Defendant's position is that he borrowed all of that money, and that is what he told the collections investigator. But based on the testimony that I have heard over the last five years, I would find that testimony or his statement to the collections investigator to be incredible, ab-

sent some additional proof. That does not necessarily place an additional burden on him, but I would note there is not a shred of evidence to support that these are loans, other than his unsupported statement that they are loans.

Of greater surprise to the Court, having previously found that McDonald Capital . . . was an asset exclusively of the Defendant and is nothing more than the Defendant in a corporate capacity, suddenly can produce $4,000 to pay for moving expenses, and, frankly, I'm stunned at that fact. So that's $9,000 in a single month. And there's nothing to—that convinces the Court by a preponderance of the evidence that those are from loan proceeds.

. . . .

I would note as additional evidence of the fact that he maintains a luxury lifestyle, he's apparently still employing a housekeeper. It's almost impossible for me to believe that whether it's a housekeeper, maid, or friend that she's doing it for free. That he would be able to maintain those assets in his current lifestyle. And then last, he would be driving a late model Audi automobile, even though it is on lease. Somebody must be paying the lease payment. And the court, under the totality of the circumstances that I've heard testified to, even if it is paid by somebody else, it's income to the Defendant.

The Court would be remiss in its responsibilities if I were to find that the Defendant is indigent under the circumstances. Indigency funds are set aside for the purpose of supporting people truly without means to hire counsel [and who] under no circumstances can afford their own attorney. And we're all aware of how destitute most of those people are. The Defendant just is not. So the Court will find he's not entitled to Court-appointed counsel, as much as I would like as a practical matter to find to the contrary.

¶ 14 After the court determined defendant was not entitled to court-appointed counsel, defendant represented himself. Defendant filed multiple motions for reconsideration and orally requested the appointment of counsel.

Defendant also filed a motion to recuse Judge Schwartz, arguing the judge was biased against him based on the court's indigency determination.

¶ 15 On March 12, 2002, defendant represented himself at the jury trial on the theft case. The jury found defendant guilty of theft, but it hung on the fourteen counts of check fraud.

¶ 16 On April 10, 2002, defendant filed a new Form JDF208 ("second affidavit") requesting counsel. On May 6 and May 13, 2002, the court held hearings on the request, and defendant testified regarding his finances. The court determined defendant was indigent and appointed counsel to represent him. On June 21, 2002, alternate defense counsel filed a motion for Judge Schwartz to recuse himself, in part because defendant had endorsed him as a witness in the perjury case. Judge Schwartz denied the motion.

¶ 17 The trial court sentenced defendant to six years in the custody of the Department of Corrections for the theft conviction.

¶ 18 Thereafter, defendant appealed his conviction to this court. While the appeal was pending, Judge Schwartz sua sponte recused himself based on an entry of appearance in the case of Judge Schwartz's former supervisor at the district attorney's office. Defendant was granted a limited remand to address Judge Schwartz's recusal, and, on remand, the successor judge vacated defendant's conviction based on the recusal. The People appealed, a division of this court reversed, *People v. Schupper*, 124 P.3d 856 (Colo.App.2005), and the supreme court affirmed. *Schupper v. People*, 157 P.3d 516 (Colo.2007).

¶ 19 The trial court reinstated defendant's conviction and sentence. Defendant now directly appeals the trial court's ruling that he was not entitled to court-appointed counsel; the trial court's failure to advise him of his right to counsel; and the trial court's rulings denying several motions to recuse.

## II. Was Defendant Indigent?

¶ 20 Defendant contends the trial court erred when it determined he was not entitled to court-appointed counsel based upon the collection investigator's report. We conclude that the trial court did not abuse its discretion in determining that, based upon information provided at numerous hearings over a period of six months, defendant was not entitled to court-appointed counsel. Accordingly, we affirm.

### A. Standard of Review

■ ¶ 21 "A trial court's finding whether a defendant is entitled to appointed counsel is reviewed for abuse of discretion, but the finding is subject to careful scrutiny because it also involves a fundamental constitutional right." *People v. Munsey*, 232 P.3d 113, 125–26 (Colo.App.2009) (citing *Nikander v. Dist. Court*, 711 P.2d 1260, 1262 (Colo.1986)), and *People v. Steinbeck*, 186 P.3d 54, 60 (Colo.App.2007).

### B. Law

¶ 22 The Sixth Amendment to the United States Constitution provides that "[i]n all criminal prosecutions, the accused shall enjoy the right ... to have the [a]ssistance of [c]ounsel for his defen[s]e." If the defendant is financially unable to retain private counsel, the trial court must appoint counsel to represent him. *Gideon v. Wainwright*, 372 U.S. 335, 343–44, 83 S.Ct. 792, 9 L.Ed.2d 799 (1963); *People v. Alengi*, 148 P.3d 154, 159 (Colo.2006).

¶ 23 Section 21–1–103 codifies the representation of indigent criminal defendants in Colorado. *Steinbeck*, 186 P.3d at 56. In pertinent part, section 21–1–103(3) states:

The determination of indigency shall be made by the state public defender, subject to review by the court. When a defendant ... requests representation by a public defender, such person shall submit an appropriate application, the form of which shall state that such application is signed under oath and under the penalty of perjury and that a false statement may be prosecuted as such.... A copy of the application shall be sent to the prosecuting attorney for review, and, upon request, the court shall hold a hearing on the issue of

the eligibility for appointment of the public defender's office.

¶ 24 "Chief Justice Directive 04–04 establishes the process for determining whether a defendant is indigent and the guidelines for the appointment of public defenders." *Steinbeck,* 186 P.3d at 56. " 'Chief Justice directives are an expression of Judicial Branch policy and are to be given full force and effect in matters of court administration.' " *Id.* (quoting *Hodges v. People,* 158 P.3d 922, 926 (Colo.2007)).

¶ 25 "The initial burden to establish indigency is upon the defendant, and this burden requires defendant to establish the lack of funds, on a practical basis, to retain counsel." *People v. Adams,* 836 P.2d 1045, 1047 (Colo.App.1991); *see Alengi,* 148 P.3d at 159–60 ("[T]he court's duty to assign an attorney to represent the defendant arises only after the defendant has made a showing of financial inability to secure counsel.").

¶ 26 "In determining the defendant's indigency the trial court should consider the defendant's complete financial situation, including real and personal property, dependency obligations, and necessary expenses and debts, and then balance assets against liabilities and income against basic living expenses." *People v. Nord,* 790 P.2d 311, 316 (Colo.1990) (citing *Nikander,* 711 P.2d at 1262). A trial court may also consider whether a defendant has secreted assets. *United States v. Rubinson,* 543 F.2d 951, 964 (2d Cir.1976) (evidence showed that the defendant owned or controlled substantial assets and "[t]o the extent that the assets were not in his name, he had them put in the names of other members of his family to conceal them from his creditors, the government and the court"); *Williams v. Superior Court,* 226 Cal.App.2d 666, 38 Cal.Rptr. 291, 294 (1964) (noting that a defendant "cannot hide his assets and demand the help of a public defender at the public expense"); *State v. Dale,* 439 N.W.2d 112, 117 (S.D.1989) ("[A] criminal defendant may not claim the status of an indigent when he transfers assets to others for wholly inadequate consideration at or near the time when criminal charges are brought when the obvious intent of the transfer is to conceal them from the government and his creditors."); *cf. United States v. Kahan,* 415 U.S. 239, 243, 94 S.Ct. 1179, 39 L.Ed.2d 297 (1974) (trial court properly admitted the defendant's pretrial hearing statements that he was indigent for the purposes of proving that the defendant had made false exculpatory statements because "[t]he truth of the matter was that [the defendant] was not indigent, and did not have a right to appointment of counsel under the Sixth Amendment").

¶ 27 "An indigent defendant requesting the appointment of counsel has the obligation to comply with reasonable procedures for the determination of his financial eligibility for court-appointed counsel." *King v. People,* 728 P.2d 1264, 1268–69 (Colo. 1986). "As fact finder, the trial court assesses the witnesses' credibility and determines the probative effect and weight of the evidence." *People v. Shifrin,* 2014 COA 14, ¶ 35, 342 P.3d 506. A court must make specific findings to support a determination of nonindigency. *Steinbeck,* 186 P.3d at 57.

## C. Analysis

¶ 28 The trial court took painstaking measures to ensure that defendant's right to counsel was protected. Initially, the court appointed counsel relying upon the recommendation of the public defender, who determined defendant was eligible for court-appointed counsel based upon defendant's representations on his affidavit. After the prosecutor challenged defendant's affidavit, the court appointed alternate defense counsel to represent him in the process of determining whether he was entitled to court-appointed counsel.

¶ 29 The court held multiple hearings in 2001: on June 21, June 28, August 2, August 6, August 13, August 16, September 9, September 19, October 10, October 29, November 19, December 13, and December 19. The majority of these hearings were for the purpose of appointing alternate defense counsel so that defendant would be represented in the indigency proceedings.

¶ 30 At the August 16, 2001 hearing, which also addressed defendant's bond in the perju-

ry cases, the court made the following findings of fact regarding defendant's assets:

> There was considerable evidence presented regarding the assets. And the Court has resolved what some of the assets are. First of all, I can tell you the things I have ignore[d]. Various pieces of evidence testified to and presented regarding the Cayman Islands accounts results in the Court finding it amounts at this point to nothing.
>
> . . . .
>
> I am not convinced that it's in any way tied to the Defendant. However, it's clear to the Court that the Defendant is the sole owner and basically operator of McDonald Corporation. Any assets of that corporation he has the right to immediate access to.
>
> . . . .
>
> So the Court considers the piano to be his which he has or recently sold for 10 to $15,000.00. The Court considers the motor vehicles to be the Defendant's, even though apparently they were owned by McDonald Corporation.
>
> The Court is convinced that he—some of them may be leased, others apparently were owned and gave rise to considerable assets that he had access to. The Court is convinced on one of the letters that was presented by the Defendant that he does not own nor does McDonald own any equity interest in the airplanes because it was indicated those have already been taken over by the finance company [and] will be sold at a loss.
>
> So there is no asset from which the Defendant could realize appreciation for those. However, the court is still mystified by luxury jet trips as recently as April of this year. The . . . Prosecution has represented Exhibit 1 indicates $80,000.00

in personal jewelry that the Defendant apparently owns.

> The Court is also surprised at the E-bay auctions that the Defendant has run in which he has put a number of high-priced assets up for sale. Last the Court notes from the result of the search that there was [$]11,000 in a cigar collection and apparently an exclusive wine collection, although there was no estimate given of that.
>
> So the Court concludes there are assets in excess of a hundred thousand dollars available to the Defendant.
>
> . . . .
>
> I would note the fact that he's paid $150,000.00 bond is of no significance because he hasn't posted it. Apparently most of it is posted by others. . . .
>
> So the Court will find that the Defendant has had in the recent past substantial luxury assets. *He has made a concerted effort to secret the assets.*

(Emphasis added.)

¶ 31 After the October 29, 2001, hearing, at which defendant's accountant testified,[3] the court appointed a collections investigator to review defendant's finances and provide an independent analysis of whether defendant was entitled to court-appointed counsel under Chief Justice Directive 97–01 (the directive in effect at the time defendant's indigency determination was made).

¶ 32 The trial court held its final hearing on defendant's indigency on December 19, 2001, where it took additional evidence and then determined defendant was not entitled to court-appointed counsel.

¶ 33 We perceive no abuse of discretion by the trial court for two reasons. First,

---

3. We note that the transcript of this hearing is not contained in the record. We must assume this hearing supports the trial court's findings on indigency. *See, e.g., Schuster v. Zwicker,* 659 P.2d 687, 690 (Colo.1983) ("It is the obligation of the party asserting error in a judgment to present a record that discloses that error, for a judgment is presumed to be correct until the contrary affirmatively appears."); *accord LePage v. People,* 2014 CO 13, ¶ 16, 320 P.3d 348. Similarly, the prosecution requested, and the court agreed, to take judicial notice of the testimony at the grand jury proceedings which led to the perjury cases. This testimony also is not in the record on appeal, and, again, we must assume it supports the trial court's findings. *See LePage,* ¶ 16; *Schuster,* 659 P.2d at 690; *see also People v. Linares-Guzman,* 195 P.3d 1130, 1135 (Colo.App.2008) ("A court may take judicial notice of its own records."); *People v. Sa'ra,* 117 P.3d 51, 56 (Colo.App.2004) ("A court may take judicial notice of the contents of court records in a related proceeding.").

the trial judge was assigned to the case in 1997, had become very familiar with defendant's situation, and conducted multiple hearings. A determination of indigency is within the sound discretion of the trial court because that court is in the best position to determine the assets which the defendant can access. *See Nikander*, 711 P.2d at 1262; *see also Commonwealth v. Godwin*, 60 Mass. App.Ct. 605, 804 N.E.2d 940, 945 (2004) ("During a hearing on indigency, a judge is warranted, as in any hearing where evidence or information is presented, to make credibility determinations."). Defendant appears to argue that the trial court should have ignored all that it knew about his various assets and relied solely upon the information provided in the affidavit and the public defender's recommendation for court-appointed counsel. If this were the case, the General Assembly would not have provided a mechanism for a prosecuting attorney to challenge an affidavit, *see* § 21–1–103(3).

¶ 34 Second, it is the defendant's burden to prove, by a preponderance of the evidence, that he is indigent. *Adams*, 836 P.2d at 1047; *see also Dale*, 439 N.W.2d at 115 ("When a defendant's ability to afford counsel has been placed into issue, the defendant has the burden of proving by a preponderance of the evidence his inability to afford counsel."); *State v. Buelow*, 122 Wis.2d 465, 363 N.W.2d 255, 259 (App.1984) (holding that "the burden of proceeding rests upon the defendant"; collecting cases). This means more than providing self-serving statements to the collections investigator that monies placed in an account are "loans" that must be repaid, rather than income. *See United States v. Harris*, 707 F.2d 653, 661 (2d Cir. 1983); *Godwin*, 804 N.E.2d at 945 ("[A] judge need not credit a defendant's unsupported claim of indigency.").

¶ 35 *Harris*, 707 F.2d 653, is instructive. In *Harris*, the defendant was charged with commodities fraud, wire fraud, mail fraud and using a false name in furtherance of a mail fraud scheme. *Id.* at 654. At his arraignment, the defendant filed a Criminal Justice Act (CJA) Form 23, a summary, one-page financial affidavit, requesting appointment of counsel under the CJA. *Id.* at 655.

The prosecution objected to defendant's request and a magistrate judge held several hearings on the matter. *Id.* In part, the prosecution introduced evidence that the defendant had earned $70,000 and $30,000 in income in the prior two years and owned at least one vehicle. *Id.* at 660. Based on the evidence before it, the magistrate judge concluded that the defendant had not met his burden of proof to establish a need for court-appointed counsel because there was "nothing to indicate that [the defendant] plausibly lack[ed] access to those funds today." *Id.* at 661. In affirming, the Second Circuit concluded:

[A] court need not take at "face value" an affidavit professing "sudden indigency" which contains material misstatements and misrepresentations. See *United States v. Kelly*, 467 F.2d 262, 266 (7th Cir.1972), cert. denied, 411 U.S. 933, 93 S.Ct. 2738 [1905], 37 [36] L.Ed.2d 151 [393] (1973). Rather, certainly where a defendant's inability to afford counsel has been put into doubt, he has the burden of coming forward with evidence to rebut the government's evidence of ability to afford counsel. If a defendant fails to come forward with additional evidence instead of relying on a terse form affidavit, and fails to prove by a preponderance of the evidence that he is financially unable to afford counsel, appointed counsel may be terminated.

*Id.*; *see Godwin*, 804 N.E.2d at 946 ("[A] defendant may properly be required to do more than supply inaccurate and misleading information for a form he knows will be used to determine his right to court-appointed counsel."); *Dale*, 439 N.W.2d at 115–16 ("The information which the defendant must provide to the trial court means information which is more than conclusory in nature. It means information to which the court can apply its judgment in reaching a decision."); *see also United States v. Davis*, 958 F.2d 47, 49 (4th Cir.1992) ("[A] defendant cannot block legitimate inquiry into his ability to afford counsel and then complain if counsel is not appointed."); *State v. Eichelberger*, 227 Neb. 545, 418 N.W.2d 580, 589 (1988) ("Exercise of the right to assistance of counsel is subject to the necessities of sound judicial administration. Criminal defendants are not

permitted to use their constitutional right to counsel to manipulate ... or to interfere with the fair administration of justice." (citation omitted)).

¶ 36 The same can be said about defendant here. The prosecution introduced evidence that defendant had assets well above the guidelines in Chief Justice Directive 97–01, and that in the prior month alone approximately $5000 had been deposited into his account, which he had spent on travel rather than basic needs. Defendant failed to come forward with additional evidence showing why he was entitled to court-appointed counsel, and instead relied on his self-serving email statements to the collections investigator that the money deposited in his account was a loan. There is nothing untoward about the trial court disregarding this statement. *See Shifrin*, ¶ 35 (credibility determinations are left to the trial court); *see also Harris*, 707 F.2d at 661; *Godwin*, 804 N.E.2d at 945 (the defendant's "failure to claim expenses for such basic necessities as food or transportation indicate[d] the cavalier and disingenuous manner in which he supplied information" on his financial affidavit, and supported the trial court's determination that he was not entitled to court-appointed counsel).

¶ 37 Defendant contends the court erred because it counted "loans as income, contrary to the law and common sense." He further complains that the trial court relied upon a history of evidence adduced over many hearings and "ignored the evidence at the indigence hearing." In doing so, defendant argues that the trial court placed "the burden on [defendant] to rebut [its] unfounded declaration." Because the burden is properly on defendant to prove his indigence, *see Adams*, 836 P.2d at 1047, the court could properly make credibility determinations based on all the evidence introduced in the approximately six months of hearings on this issue, *see Nikander*, 711 P.2d at 1262. The trial court's finding that defendant "lived a luxury lifestyle" was supported by the evidence introduced at the hearings regarding defendant's use of private jets; rental of an approximately 8000-square-foot home; and ownership of multiple cars, $80,000 in jewelry, an $11,000 cigar collection, and a wine collection with an unknown value.

¶ 38 Thus, we conclude the trial court properly weighed the evidence before it and did not abuse its discretion in determining that defendant was not entitled to court-appointed counsel.

### III. Was the Trial Court Required to Give an *Arguello* Advisement?

¶ 39 Defendant next contends that the court erred by failing to provide him with an express advisement concerning his right to counsel pursuant to *People v. Arguello*, 772 P.2d 87 (Colo.1989), before forcing him to proceed pro se at trial. We are called upon to decide whether this case is one of the rare exceptions to *Arguello*'s holding that a court's failure to substantially comply with advising a defendant renders the defendant's waiver of counsel invalid. *See id.* at 95–96. We conclude that it is.

#### A. Standard of Review

¶ 40 "Whether a defendant made an effective waiver of the right to counsel is a mixed question of law and fact reviewed de novo." *Munsey*, 232 P.3d at 127.

#### B. Law

¶ 41 The fundamental right to counsel is guaranteed by the Sixth Amendment to the United States Constitution. *Gideon*, 372 U.S. at 339–40, 83 S.Ct. 792; *Anaya v. People*, 764 P.2d 779, 781 (Colo. 1988). The right to counsel includes the right to a court-appointed attorney for an indigent defendant and the right to retain an attorney for nonindigent defendants. *King*, 728 P.2d at 1268. In either scenario, before a defendant is allowed to proceed pro se, the defendant first must effect a valid waiver of the right to counsel. *Arguello*, 772 P.2d at 92–93; *see also Faretta v. California*, 422 U.S. 806, 835, 95 S.Ct. 2525, 45 L.Ed.2d 562 (1975).

¶ 42 A defendant may waive assistance of counsel either expressly or impliedly through his conduct. *Alengi*, 148 P.3d at 159. An implied waiver occurs when the defendant is deemed to have forfeited the right to counsel, as opposed to having made a

deliberate decision to forgo the right. *Arguello*, 772 P.2d at 93. A waiver is not valid, however, until the court ensures that the waiver is made knowingly and intelligently. *People v. Rawson*, 97 P.3d 315, 318 (Colo. App.2004). Although most courts use the terminology of "implied waiver," rather than an informed and deliberate decision to waive the right, in the right circumstances a defendant's conduct may more accurately be described as a forfeiture. *Arguello*, 772 P.2d at 93.

¶ 43 Before a court may find a valid implied waiver based on a defendant's conduct, "there must be ample, unequivocal evidence in the record that the defendant was advised properly in advance of the consequences of his actions." *Id.* at 97. While there is no formulaic inquiry, trial courts must probe, at a minimum, the defendant's awareness of the right to counsel and the defendant's understanding of the many risks of self-representation. *Alengi*, 148 P.3d at 159 (citing *Arguello*, 772 P.2d at 94–95, and *People v. Stanley*, 56 P.3d 1241, 1244 (Colo. App.2002)).

¶ 44 To further facilitate this inquiry, trial courts should inquire into the defendant's education, legal training, and experience with criminal law, and determine whether the defendant is under the influence of any drug, medication, or alcohol that would affect his understanding. *Arguello*, 772 P.2d at 97–98 (instructing courts to follow guidelines in the *Colorado Trial Judge's Benchbook*); *Rawson*, 97 P.3d at 319; *see King*, 728 P.2d at 1270 ("[T]he trial court, before forcing the defendant to trial without the benefit of counsel, had the duty to make a careful inquiry about the defendant's financial condition, the defendant's understanding of his right to counsel, and his desires regarding legal representation."). And the court should inquire into whether the defendant understands his rights to counsel, confrontation, cross-examination, subpoena witnesses, and remain silent, and whether the defendant understands the charges and possible penalties in his case and the risks of self-representation. *Arguello*, 772 P.2d at 97–98.

¶ 45 "A court's failure to comply substantially with this requirement does not automatically render the waiver invalid, but is an exception which should rarely be invoked." *Id.* at 96. Thus, on appeal, the reviewing court must not only look at the advisement, but also weigh the totality of the circumstances in ascertaining the validity of the waiver. *Id.*; *People v. Smith*, 881 P.2d 385, 388 (Colo.App.1994) (under certain circumstances, waiver of counsel may be valid without the "extensive colloquy" outlined in *Arguello*). "The state bears the burden of demonstrating that a waiver of counsel was knowingly, intelligently, and voluntarily made." *King*, 728 P.2d at 1268. Once a prima facie case has been established that the waiver was effective, the defendant may overcome it with competent evidence showing that the waiver was not voluntary, knowing, and intelligent. *Arguello*, 772 P.2d at 92.

## C. Analysis

¶ 46 Here, the record establishes, and the People concede, that the trial court never gave defendant an express advisement of his rights under *Arguello* after it decided defendant was not entitled to court-appointed counsel. Thus, we must look to the totality of the circumstances surrounding defendant's choice to represent himself at trial to determine whether defendant impliedly waived his right to counsel. Based on the unique circumstance of this case, we conclude that defendant knowingly, intelligently, and voluntarily waived his right to counsel.

¶ 47 First, the record establishes that defendant knew of his right to counsel, his right to court-appointed counsel if he was indigent, and the importance of having counsel. In the multitude of hearings the trial court held on defendant's request for court-appointed counsel, defendant made repeated statements about how complicated his case was, that he needed an attorney because of the nature of the case, and that he wanted an attorney to represent him. Thus, defendant was fully aware of his Sixth Amendment rights.

¶ 48 Second, defendant understood the charges against him and the possible penalties from those charges. At one hearing, defendant expressed concern that he was

facing a possible 400–year prison sentence if he was convicted on all charges against him. The record also reflects that defendant repeatedly expressed concern over how serious the charges against him were, and how much discovery was required to prove the charges.

¶ 49 Third, defendant is highly-educated. The record contains a copy of his resume where he lists a Bachelor of Arts degree in Management from Boston University and two years at Harvard Business School. Defendant's resume also indicates that he was in U.S. Army Intelligence in Vietnam, and he claims to have "[d]eveloped, built company and marketed first desktop medical billing system," "[g]rew computer retail business from scratch to $300,000 per month in nine months," and "[s]tarted, managed and grew high-tech venture fund from $10m to $97m."

¶ 50 Fourth, defendant understood his Fifth Amendment right to remain silent. During an early hearing in which the public defender's office moved to withdraw, defendant stated he was concerned with "specifically my Fifth and Sixth Amendment rights." Several times during the hearings on defendant's request for court-appointed counsel, defendant asked to speak ex parte with the court so that the information he disclosed could not be used against him by the district attorney. This demonstrates a complete awareness of his Fifth Amendment rights.

¶ 51 Fifth, defendant understood his right to subpoena and confront witnesses, evidenced by the fact that he subpoenaed witnesses for trial and cross-examined witnesses at trial.

¶ 52 In sum, after the trial court determined that defendant was not entitled to court-appointed counsel, defendant's appearance at the next hearing without securing private counsel was tantamount to a knowing, intelligent, and voluntary waiver of his right to counsel. *See People v. Litsey,* 192 Colo. 19, 23, 555 P.2d 974, 977 (1976) (where nonindigent defendant did not retain private counsel and appeared at trial, trial court "properly construed the defendant's actions ... as a waiver of the right to counsel"). Under the circumstances of this case, to determine otherwise would be to ignore the vast evidence in the record establishing that defendant was fully aware of his rights.

¶ 53 Our conclusion that defendant knowingly, intelligently, and voluntarily waived his right to counsel by appearing pro se after the trial court denied his request for court-appointed counsel is supported by decisions in other jurisdictions. *See, e.g., Burnett v. State,* 182 Ga.App. 539, 356 S.E.2d 231, 234 (1987) (After the court determined the defendant was not entitled to court-appointed counsel, the defendant's failure to hire counsel was a waiver of his right to counsel because " '[i]f [he] was not indigent, [his] failure to retain counsel constituted waiver.' " (quoting *Ward v. State,* 248 Ga. 60, 281 S.E.2d 503, 507 (1981))); *State v. Hindman,* 441 N.W.2d 770, 772 (Iowa 1989) (finding the defendant waived his right to counsel because "the district court's obligation to this nonindigent defendant was to advise him that he was entitled to the assistance of counsel at all critical stages of the proceedings, to admonish him concerning the disadvantages of proceeding without counsel, and otherwise to act so as not to interfere with defendant's freedom to obtain counsel"); *Godwin,* 804 N.E.2d at 943 n. 6 ("In a case where, as here, there has been a determination that the defendant is not entitled to court-appointed counsel, and where the defendant then does not secure counsel at his own expense, the effect is tantamount to waiver of the right to be represented by counsel."); *State ex rel. Tanzey v. Richter,* 762 S.W.2d 857, 858 (Mo. Ct.App.1989) ("A non-indigent defendant who wants counsel but refuses to hire one will be allowed to proceed pro se."); *State v. Tharp,* 224 Neb. 126, 395 N.W.2d 762, 765 (1986) (the court properly determined that the defendant was not entitled to court-appointed counsel and afterwards the "[d]efendant chose to appear without counsel on repeated occasions. We hold that once a defendant has been informed of his right to retained or appointed counsel ... his conduct in appearing without counsel may result in a waiver of counsel."); *Buelow,* 363 N.W.2d at 260 ("As the record shows that the [defendants] had funds available to retain counsel, they were not denied their right to counsel. By proceeding pro se, they waived the right to be represented by counsel at trial."); *but see*

*People v. Stoops,* 313 Ill.App.3d 269, 245 Ill. Dec. 884, 728 N.E.2d 1241, 1245 (2000) (where court failed to give an express advisement of counsel to the nonindigent defendant under Illinois Supreme Court Rule 401(a), the case was remanded for a new trial because the defendant had not waived his right to counsel); *Parish v. State,* 989 N.E.2d 831, 837–39 (Ind.Ct.App.2013) (where court determined the defendant was not entitled to court-appointed counsel but did not advise the defendant of the "dangers and disadvantages of self-representation," the record did not establish the defendant knowingly and intelligently waived his right to counsel).

¶ 54 Consequently, based on the totality of the circumstances attending defendant's numerous appearances at indigency hearings, when defendant appeared in court pro se after learning that he did not qualify for court-appointed counsel, he knowingly, intelligently, and voluntarily waived his right to counsel.

### IV. Was the Trial Court Biased?

¶ 55 Defendant contends that Judge Schwartz erred in denying his repeated requests for recusal based upon the court's alleged bias. We disagree.

### A. Standard of Review

¶ 56 We review a trial court's ruling on a motion to recuse de novo. *People v. Flockhart,* 2013 CO 42, ¶ 44, 304 P.3d 227; *People v. Julien,* 47 P.3d 1194, 1197 (Colo. 2002) (judicial disqualification decisions are subject to de novo review). Judicial bias against a criminal defendant constitutes structural error requiring reversal. *Krutsinger v. People,* 219 P.3d 1054, 1059 n. 1 (Colo.2009).

### B. Law

¶ 57 A court must be free of any bias, prejudice, or interest directed toward any party or witness. *People v. Rodriguez,* 209 P.3d 1151, 1162 (Colo.App.2008), *aff'd,* 238 P.3d 1283 (Colo.2010).

Colorado law offers three interrelated guideposts for judicial disqualification: Colorado Rule of Criminal Procedure 21(b), section 16–6–201 of the Colorado Revised Statutes, and Canon 3 of the Colorado Code of Judicial Conduct. Rule 21(b) and section 16–6–201 both provide that a judge should disqualify himself upon a showing that he "is in any way interested or prejudiced with respect to the case, the parties, or counsel." Canon 3 of the Code of Judicial Conduct is slightly more expansive, stating:

> A judge should disqualify himself or herself in a proceeding in which the judge's partiality might reasonably be questioned, including but not limited to instances where ... [a] judge has a personal bias or prejudice concerning a party ... [or] a lawyer with whom the judge previously practiced law served during such association as a lawyer concerning the matter....

*Schupper,* 157 P.3d at 519.[4] Thus, a judge must disqualify himself when facts exist "demonstrating that the judge had personal knowledge of disputed evidentiary facts concerning the case, some supervisory role over the attorneys who were prosecuting the case, or some role in the investigation and prosecution of the case during the judge's former employment." *Flockhart,* ¶ 49 (citing *Julien,* 47 P.3d at 1198).

¶ 58 However, "rulings of a judge, although erroneous, numerous and continuous, are not sufficient in themselves to show bias or prejudice." *Saucerman v. Saucerman,* 170 Colo. 318, 326, 461 P.2d 18, 22 (1969); *accord Schupper,* 157 P.3d at 521 n. 5; *Goebel v. Benton,* 830 P.2d 995, 1000 (Colo.1992) ("A ruling by a judge on a legal issue does not require disqualification absent facts in the motion or affidavits from which it may reasonably be inferred that the judge is biased or prejudiced or has a bent of mind.").

¶ 59 To warrant reversal, "more than mere speculation concerning the possibility of prejudice must be demonstrated." *People v. Coria,* 937 P.2d 386, 391 (Colo.

---

4. The Code of Judicial Conduct was repealed and readopted in May 2010, and a judge's duty to disqualify himself is now located at C.J.C. 2.11.

1997). The record must clearly establish bias. "The test is whether the trial judge's conduct so departed from the required impartiality as to deny the defendant a fair trial." *Rodriguez*, 209 P.3d at 1162.

## C. Analysis

¶ 60 Initially, we interpret the majority of defendant's recusal arguments to be founded on the premise that because Judge Schwartz ruled against him on his indigency determination, the judge must have been biased. However, the supreme court stated that the successor judge erred by suggesting that Judge Schwartz's indigency determination "contributed to an appearance of partiality." *Schupper*, 157 P.3d at 521 n. 5. "An indigency determination, like the one made by Judge Schwartz in this case, generally is insufficient to show bias." *Id.*; *see Liteky v. United States*, 510 U.S. 540, 555, 114 S.Ct. 1147, 127 L.Ed.2d 474 (1994) ("[J]udicial rulings alone almost never constitute a valid basis for a bias or partiality motion."). Accordingly, we reject that portion of defendant's argument alleging bias based on Judge Schwartz's indigency determination.

### 1. Second Motion to Recuse [5]

¶ 61 Defendant's second motion to recuse is almost entirely based upon Judge Schwartz's indigency determination and fails for the reason stated above. *See Schupper*, 157 P.3d at 521 n. 5; *Goebel*, 830 P.2d at 1000. However, the motion also alleges that "forcing the Defendant to proceed *pro se* in these complex trials with less than 3 months to prepare indicate[s] an unfavorable bias of Judge Schwartz against Defendant." The court denied the motion because "[t]he statements of the affiants are generally not statements of fact but conclusions that they have reached after reviewing certain documents." We agree with the court that nothing in the affidavits attached to the motion alleges anything more than "mere speculation" based upon an adverse ruling. This is an insufficient basis for recusal. *See Coria*, 937 P.2d at 391; *Goebel*, 830 P.2d at 1000; *see also Smith v. Dist. Court*, 629 P.2d 1055, 1056

(Colo.1981) ("Unless a reasonable person could infer that the judge would in all probability be prejudiced against the petitioner, the judge's duty is to sit on the case."). Furthermore, Judge Schwartz specifically stated that, as a practical matter, he would have preferred appointing counsel for defendant, and this statement is inconsistent with defendant's allegation of bias.

### 2. Third Motion to Recuse

¶ 62 In his third motion to recuse, defendant argued Judge Schwartz was biased because (1) the judge became a material witness in the perjury cases against defendant; (2) the judge ruled against him in the indigency hearing; and (3) the judge ignored acts of prosecutorial misconduct. As discussed above, the court's determination at the indigency hearing does not evidence bias. *Schupper*, 157 P.3d at 521 n. 5. We have found no support for defendant's argument that the acts of the prosecutor are somehow attributable to the trial court. If defendant's argument is that the court ruled in favor of the prosecution, which is unclear from the record presented by defendant, "rulings of a judge, although erroneous, numerous and continuous, are not sufficient in themselves to show bias or prejudice." *See Saucerman*, 170 Colo. at 326, 461 P.2d at 22.

¶ 63 Regarding the allegation that Judge Schwartz was a material witness in the perjury cases, at the time of defendant's third motion, C.J.C. 3(C)(1)(d)(IV) stated in pertinent part that "[a] judge should disqualify himself or herself in a proceeding in which the judge's impartiality might reasonably be questioned, including" when the judge knows that he or she is "likely to be a material witness *in the proceeding*." (Emphasis added.) Judge Schwartz concluded that he was not required to recuse because "[a]nother Court is handling" the perjury cases and the cases "were transferred to another Court immediately after filing." Accordingly, he reasoned "it will not violate the rule against handling a case in which the Court will likely be a witness."

---

**5.** Defendant does not appeal the trial court's denial of his first motion to recuse, acknowl-

edging that the affidavits supporting that motion failed to allege facts warranting recusal.

¶ 64 We agree with Judge Schwartz's conclusion that because the case would not be heard in his court, he was not a material witness *in the proceeding* he was currently handling. *Cf. United States v. Rivera*, 802 F.2d 593, 601 (2d Cir.1986) (applying similar federal recusal law and concluding that a judge need not recuse himself from deciding a motion on whether to grant a hearing even though the judge could become a material witness if the hearing was granted); *United States v. Edwards*, 39 F.Supp.2d 692, 705 (M.D.La.1999) ("Neither counsel nor a party may seek recusal of a judge by announcing that [he] intend[s] to call the judge as a witness.").

■ ¶ 65 We further conclude that Judge Schwartz would not be a material witness in the perjury cases because a "material witness" is " 'a witness who gives testimony going to some fact affecting the merits of the cause *and about which no other witness might testify.*' " *Ex parte Jones*, 86 So.3d 350, 352 (Ala.2011) (quoting *Callahan v. State*, 557 So.2d 1292, 1307–08 (Ala.Crim. App.1989), *aff'd sub nom. Ex parte Callahan*, 557 So.2d 1311 (Ala.1989), and collecting cases); *Bresnahan v. Luby*, 160 Colo. 455, 458, 418 P.2d 171, 173 (1966) ("Where the evidence concerning the transactions in issue may be obtained from witnesses other than the trial judge, then the trial judge is not such a material witness as to require a disqualification."). Here, both defense counsel and the prosecution were present at all times defendant alleged created the need for Judge Schwartz to be a material witness, and, accordingly, the court was correct in denying recusal based upon this allegation.

### 3. Remaining Allegations of Bias

¶ 66 We are similarly unpersuaded by defendant's remaining contentions, which the record indicates are meritless, that Judge Schwartz was biased because (1) he failed to allow defendant to explain why he was pro se at trial; (2) he "has a pattern of forcing indigent defendants to trial without counsel"; and (3) he "had to know that this Court would reverse the conviction in this case because once again he forced an indigent defendant to trial without counsel" but nevertheless "proceeded to sentencing." *See, e.g., People v. Walden*, 224 P.3d 369, 378 (Colo. App.2009) (there must be record evidence of an attitude of hostility or ill will toward the defendant that would raise a reasonable question about the court's impartiality); *People v. Simpson*, 93 P.3d 551, 555 (Colo.App. 2003) (declining to consider "bald legal propositions presented without argument or development").

### V. Conclusion

¶ 67 The judgment is affirmed.

Dunn and Plank *, JJ., concur