23CA1855 Peo v Eddington 02-19-2026

COLORADO COURT OF APPEALS

---

Court of Appeals No. 23CA1855
Douglas County District Court No. 19CR479
Honorable Ryan J. Stuart, Judge

---

The People of the State of Colorado,

Plaintiff-Appellee,

v.

Harlan Nelson Eddington,

Defendant-Appellant.

---

SENTENCE AND ORDER AFFIRMED

Division I
Opinion by JUDGE LUM
J. Jones and Meirink, JJ., concur

**NOT PUBLISHED PURSUANT TO C.A.R. 35(e)**
Announced February 19, 2026

---

Philip J. Weiser, Attorney General, Brittany Limes Zehner, Senior Assistant
Attorney General and Assistant Solicitor General, Denver, Colorado, for
Plaintiff-Appellee

Megan A. Ring, Colorado State Public Defender, Kevin M. Whitfield, Deputy
State Public Defender, Denver, Colorado, for Defendant-Appellant

¶ 1     Defendant, Harlan Nelson Eddington, pleaded guilty to two crimes involving the death of his romantic partner.  He appeals his sentence and the order imposing restitution.

## I.    Background

¶ 2     Eddington and his romantic partner, Molly Sadler, got into a verbal dispute while Eddington was driving on Highway 67.  Eddington suddenly turned his doorless Jeep into oncoming traffic, and a car collided with the passenger side of the vehicle, where Sadler was sitting.  Eddington got out of the vehicle immediately after the collision and ran from the scene.  Police apprehended him on foot several hours later and noted that he appeared to be under the influence of alcohol.  Sadler was taken to the hospital and died the next day due to injuries sustained in the crash.  At the time of the collision, a protection order prohibited Eddington from interacting with Sadler and from using alcohol or controlled substances.

¶ 3     Eddington pleaded guilty to leaving the scene of an accident in violation of section 42-4-1601(1), (2)(c), C.R.S. 2025, and vehicular homicide in violation of section 18-3-106(1)(a), C.R.S. 2025.  The plea agreement contained a stipulated sentencing range of four to

eighteen years in the custody of the Department of Corrections (DOC). The sentencing court imposed an eighteen-year sentence. The court also ordered Eddington to pay $5,487 in restitution to compensate the Crime Victim Compensation Board (CVCB)[1] for payments it made to Sadler's family for her funeral and burial expenses.

¶ 4 Eddington now argues that (1) the sentencing judge was biased against him, and (2) the sentencing judge erred by ordering him to pay the full amount of restitution to the CVCB when Sadler's family had also received donations from a GoFundMe campaign. We address each contention in turn.

---

[1] The terms "Crime Victim Compensation Board" and "Crime Victim Compensation Fund" are used interchangeably throughout the record in this case. Prior opinions from this court discussing restitution use both "board" and "fund" and also refer to a "Crime Victim Compensation Program." As best we can discern, all these terms refer to an entity that is a "victim" under the restitution statute because it is a "victim compensation board that has paid a victim compensation claim." § 18-1.3-602(4)(a)(IV), C.R.S. 2025. Thus, for consistency, we use the term "CVCB" throughout this opinion.

## II.    Sentencing

¶ 5    Eddington argues that his eighteen-year sentence (the maximum possible sentence under the plea agreement) is the result of actual bias on the part of the sentencing judge.  We disagree.

### A.    Additional Background

¶ 6    At the sentencing hearing, the court heard testimony from eight witnesses for the State, one mitigation witness for the defense, and from Eddington.  After the testimony and while sentencing Eddington, the judge made the following remarks:

- People who never met Sadler "will never get to see this beautiful face.  People who never met her, like myself, will never get to hear this beautiful laugh.  We'll never get a kiss on the lips and a hug when I meet her.  And that's a loss.  Everyone's a victim."

- "You killed [Sadler] . . . And like what your witness said, it is all your fault."

- Sadler "suffered a year of abuse under the hands of Mr. Eddington."

- The most haunting part of the case is Sadler's words that "were overheard by a witness about Mr. Eddington killing

her, and Mr. Eddington's father warning her. [Sadler] knew she was going to die in the hands of Mr. Eddington. She didn't know when; she didn't know how, but I think she knew."

### B.     Standard of Review and Applicable Law

¶ 7     Because Eddington didn't move to disqualify the sentencing judge, our review is limited to whether the judge displayed "actual bias." *People v. Dobler*, 2015 COA 25, ¶¶ 6-7. We review claims of actual bias de novo. *People v. Jennings*, 2021 COA 112, ¶¶ 27-28.

¶ 8     Actual bias is "bias or prejudice that in all probability will prevent [a judge] from dealing fairly with a party." *People v. Julien*, 47 P.3d 1194, 1197 (Colo. 2002). A defendant arguing that the trial judge was biased "must establish that the judge had a substantial bent of mind against him." *People v. Drake*, 748 P.2d 1237, 1249 (Colo. 1988). Mere speculative statements are not enough, and the record must clearly establish such bias. *Id.*

¶ 9     In Colorado, "[t]he general rule of law is that what a judge learns in his judicial capacity is a proper basis for judicial observations, and that the use of such information is not the kind of matter that results in disqualification." *Smith v. Dist. Ct.*, 629

P.2d 1055, 1057 (Colo. 1981). "[O]pinions formed by the judge on the basis of facts introduced or events occurring in the course of the current proceedings . . . do not constitute a basis for a bias or partiality motion unless they display a deep-seated favoritism or antagonism that would make fair judgment impossible." *Dobler*, ¶ 25 (quoting *Liteky v. United States*, 510 U.S. 540, 555 (1994)).

### C.    Analysis

¶ 10    Eddington argues that the sentencing judge was biased for two reasons.  First, he argues that the sentencing judge exhibited actual bias by "counting himself as a victim" and by telling Eddington that Sadler's death was "all [Eddington's] fault."  Second, Eddington contends that the judge based his opinions about Eddington (and, thus, the sentence) on facts that weren't in the record.  We address each argument in turn.

#### 1.    "Victim" and "Fault" Remarks

¶ 11    Eddington argues that the sentencing judge exhibited actual bias when he said, "We'll never get a kiss on the lips and a hug when I meet [Sadler].  And that's a loss.  Everyone's a victim."  He also contends the judge exhibited bias when he admonished Eddington by telling him, "[I]t is all your fault."  We disagree.

5

¶ 12    Read in context, the record reveals that the judge's observation that "[p]eople who never met [Sadler], like myself," would never receive a "kiss on the lips and a hug" related directly to the following testimony from Sadler's niece:

> I loved introducing new people to her, without warning, and she would go in for that kiss and big old hug and surprise them.  No one will ever get that experience again.  There are not that many people in the world that are willing to show that much love as she did to anyone she met, to anyone.

¶ 13    The judge's statements showed empathy to Sadler's family, acknowledged their testimony about the warm greetings Sadler gave to strangers, and acknowledged the impact the family believed Sadler's loss had had on the community.  They don't display "deep-seated favoritism" toward Sadler or "deep-seated . . . antagonism" against Eddington.  *Liteky*, 510 U.S. at 555; *Dobler*, ¶¶ 25-26.

¶ 14    Regarding the sentencing court's statement, "[I]t is all your fault," we likewise disagree with Eddington that this statement displays a "deep-seated . . . antagonism" amounting to actual bias.  *Id.*  Instead, we view this statement as an opinion formed based on the following facts introduced during the proceedings.  *Id.*

¶ 15    During the sentencing hearing, the prosecutor recounted that before police arrested Eddington, he told officers, "No, this was [Sadler]'s fault," and "It's her fault, not mine. I'm a Good Samaritan. I just wanted to get her help." Defense counsel acknowledged, "But, certainly, something we do all agree in this room, I think every single person, is that Ms. Sadler did not need to die; she shouldn't have died, and Mr. Eddington's conduct was — was the result — or her death was a result of Mr. Eddington's conduct." Viewed in context, the judge's comment merely admonished Eddington for initially attempting to place blame on Sadler and reflected Eddington's admitted guilt for the conduct that caused her death.

### 2.    Facts in the Record of the Proceeding

¶ 16    Next, Eddington contends that the judge's statement that Sadler "suffered a year of abuse under the hands of Mr. Eddington" and his opinion that Sadler "knew she was going to die in the hands of Mr. Eddington" aren't supported by the record and, therefore, indicate actual bias. We aren't persuaded.

¶ 17    During the sentencing hearing, the People discussed Eddington's criminal history and noted that he was charged with

assaulting Sadler in 2018 (about six months before Sadler's death), his driver's license was later revoked for driving under the influence, and a protection order was put in place protecting Sadler from Eddington. Defense counsel said during the hearing, "So Mr. Eddington and Ms. Sadler were together for about a year prior to her death. And by all accounts, it was a tenuous relationship. You see from Mr. Eddington that he has a history of domestic violence."

¶ 18    Based on these remarks and Eddington's prior charge for assaulting Sadler, the court seemingly concluded that Eddington had abused Sadler throughout their yearlong relationship. At most, this reflects an unsupported factual finding, which is insufficient to show that the judge was biased against Eddington. *Cf. People v. Schupper*, 2014 COA 80M, ¶ 58 ("[R]ulings of a judge, although erroneous, numerous[,] and continuous, are not sufficient in themselves to show bias or prejudice." (quoting *Saucerman v. Saucerman*, 461 P.2d 18, 22 (Colo. 1969))).

¶ 19    We don't perceive the judge's statement that Sadler "knew she was going to die in the hands of Mr. Eddington" to show actual bias either. Sadler's mother testified that Eddington's father told Sadler at one point, "Molly, you need to stay away from him. He's going to

8

kill you." Sadler's mother then testified, "His dad knew what was going to happen to [Sadler]." The prosecution also recounted statements made by a man who overheard parts of the argument between Eddington and Sadler before the collision, including overhearing Sadler say to Eddington, "Oh, I suppose now you're just gonna kill me." The judge's remarks about Sadler's knowledge were based on reasonable inferences drawn from the record at the sentencing.

### III. Restitution

¶ 20 Eddington next argues that the sentencing court erred by ordering him to pay the CVCB the amount of restitution requested by the prosecution even though Sadler's family had also received donations from community fundraising. We disagree.

### A. Additional Background

¶ 21 After the sentencing hearing, the People filed a "Restitution Payout Order/Judgment" requesting restitution in the amount of $5,487 to compensate the CVCB for funds it paid to Sadler's family for her funeral and burial expenses. Eddington filed an objection. Screenshots attached to the objection indicated that Sadler's sister had organized a GoFundMe campaign, requesting donations for

(1) veterinary expenses for Sadler's dog; and (2) expenses related to Sadler's funeral, burial, and cremation. The screenshots also indicated that the campaign had raised $2,608 for Sadler's family. Eddington argued — as he does here — that the CVCB was entitled to reimbursement from Sadler's family under section 24-4.1-110, C.R.S. 2025, because the GoFundMe donations provided the family with a collateral source of funds for the same expenses covered by the CVCB. Thus, Eddington continued, he was entitled to a setoff or reduction in the amount of restitution owed to the CVCB.

¶ 22 The People responded to the objection, attaching an email from the director of the CVCB, who noted that the CVCB didn't require reimbursements of private donations because it couldn't confirm how donated funds were used. (For example, in this case, it couldn't confirm that Sadler's family used the donated funds for her funeral expenses.)

¶ 23 After a brief hearing at which the court heard further argument but didn't receive evidence, the court concluded that Eddington hadn't met his burden to show that the restitution amount should be set off or decreased because there were "no strings attached" and "no restrictions placed" on the family's use of

10

the donated funds. Therefore, the court concluded, Sadler's family wasn't required to reimburse the CVCB. The court then ordered Eddington to pay $5,487 in restitution.

### B. Standard of Review

¶ 24 We interpret statutes de novo. *People v. Roddy*, 2021 CO 74, ¶ 17. In construing a statute, we aim to give effect to the legislative intent. *Id.* To discern the legislature's intent, we look first to the plain language of the statute and give "its words and phrases their plain and ordinary meaning." *People v. Weeks*, 2021 CO 75, ¶ 25 (citation omitted). We must construe a statute "as a whole" with an eye toward "giving consistent, harmonious, and sensible effect to all of its parts" while avoiding "constructions that would render any words or phrases superfluous or lead to illogical or absurd results." *McCoy v. People*, 2019 CO 44, ¶ 38. When the language is clear and unambiguous, we give effect to the plain and ordinary meaning "and look no further." *Cowen v. People*, 2018 CO 96, ¶ 12.

### C. Applicable Law

#### 1. Statutory Law

¶ 25 Convicted offenders must "make full restitution to those harmed by their misconduct." § 18-1.3-601(1)(b), C.R.S. 2025.

11

Restitution means "any pecuniary loss suffered by a victim. . . [that is] proximately caused by an offender's conduct and that can be reasonably calculated and recompensed in money." § 18-1.3-602(3)(a), C.R.S. 2025.  The purposes of restitution are to deter future criminality and to "lessen the financial burdens inflicted upon" crime victims as compensation for hardship and suffering.  § 18-1.3-601(1)(d)-(e).

¶ 26    Crime victims and their family members may seek compensation from the CVCB for losses caused by an offender's criminal conduct.  §§ 24-4.1-102(1), -108, -109(1), C.R.S. 2025.  A "victim compensation board that has paid a victim compensation claim" is a "[v]ictim" for purposes of the restitution statute. § 18-1.3-602(4)(a)(IV).  And if a CVCB has provided assistance to or on behalf of a victim, "the amount of assistance provided and requested by the [CVCB] is presumed to be a direct result of the defendant's criminal conduct."  § 18-1.3-603(10)(a), C.R.S. 2025.

¶ 27    Under certain circumstances, a defendant may be entitled to a reduction or setoff in the amount of restitution owed to a victim.  A restitution order may be (1) decreased if the "defendant has otherwise compensated the victim . . . for the pecuniary losses

12

suffered" or (2) set off by the amount of "compensatory damages" recovered by the victim "in any federal or state civil proceeding." § 18-1.3-603(3)(b)(II), (6); *see also* § 18-1.3-603(8)(c)(I) ("[A] court may not award restitution to a victim concerning a pecuniary loss for which the victim has received or is entitled to receive benefits or reimbursement under a policy of insurance or other indemnity agreement.").  The defendant bears the burden of proving entitlement to any such reduction or setoff.  *People v. Lassek*, 122 P.3d 1029, 1034 (Colo. App. 2005), *overruled on other grounds by*, *Sullivan v. People*, 2020 CO 58, ¶ 18.

¶ 28 The Crime Victim Compensation Act (the compensation act) describes the CVCB's obligations if the victim or the victim's family seeks funds from the CVCB and also receives compensation from a collateral source, including a "private source."  § 24-4.1-110(1)-(2).  In such cases, the CVCB "may" deduct the amount received from the collateral source from the compensation it pays out.  § 24-4.1-110(1).  Likewise, any person receiving CVCB compensation who "also receives a collateral sum" that has not been deducted "shall refund to the [CVCB] the lesser of the

13

sums . . . unless the aggregate of both sums does not exceed the person's losses."  § 24-4.1-110(2).

### 2.     *Lassek*, *Stanley*, and *Gregory*

¶ 29     Because both parties' arguments before the sentencing court and before this court are guided by *People v. Lassek*, 122 P.3d 1029; *People v. Stanely*, 2017 COA 121; and *People v. Gregory*, 2019 COA 184, we briefly discuss those cases.

### a.     *People v. Lassek*

¶ 30     In *Lassek*, the defendant pleaded guilty to charges related to a fatal traffic accident.  *Lassek*, 122 P.3d at 1031.  The sentencing court ordered restitution that included burial, travel, and lodging expenses incurred by the victim's parents.  *Id.* at 1034-35.  The defendant sought a $50,000 setoff based on a settlement payment made by his automobile insurer to the victim's family.  *Id.*  However, the settlement agreement "did not identify any particular losses covered by the payment."  *Id.* at 1035.  As a result, a division of this court noted that the victim's parents could "allocate the entire settlement to noneconomic damages," which weren't covered by restitution.  *Id.*  Thus, the division held that the defendant wasn't

entitled to set off the insurance settlement against his restitution order. *Id.*

b. *People v. Stanley*

¶ 31    In *Stanley*, the defendant pleaded guilty to felony vehicular assault, driving under the influence, and careless driving. *Stanley,* ¶ 6. The prosecution sought restitution in the amount of $30,000 to compensate the CVCB for payments made to the direct victim for lost wages and medical expenses. *Id.* at ¶ 7. The defendant sought a setoff of $25,000, arguing that his insurer had settled with the victim for that amount through an agreement that covered "any and every claim, demand, right or cause of action" including "personal injuries and consequences thereof" and any "loss of services" resulting from the incident. *Id.* at ¶¶ 2, 5, 11-12. The sentencing court awarded the defendant a $25,000 setoff, and the People appealed. *Id.* at ¶ 12.

¶ 32    A division of this court concluded that the settlement agreement's references to "personal injuries" and "loss of services" sufficiently established that the defendant met his initial burden of demonstrating that the insurance settlement was intended to cover lost wages and medical expenses, which were the same losses

15

covered by the CVCB's payment to the victim. *Id.* at ¶ 28. The

division applied section 18-1.3-603(3) and (6) to conclude that, once

a defendant demonstrates that a civil settlement includes the same

categories of losses or expenses for which the victim received CVCB

compensation, the defendant has met the initial "burden of going

forward" with evidence that the victim received a double recovery.

*Id.* at ¶¶ 30, 34. The division remanded the case for further

proceedings to give the prosecution an opportunity to rebut the

inference. *Id.* at ¶ 34.

### c. *People v. Gregory*

In *Gregory*, the defendant pleaded guilty to two counts of

vehicular homicide. *Gregory*, ¶ 2. The defendant's insurance

company settled with the deceased victims' families, who each

received $500,000 in exchange for release of all claims stemming

from the incident. *Id.* The CVCB paid the deceased victims'

families $15,513.43, collectively, to cover expenses for funerals,

travel, and mental health counseling. *Id.* at ¶ 3. Noting that the

CVCB wasn't a party to the settlement agreements, the court

entered a restitution order for the entire amount requested by the

prosecution.[2]  *Id.* at ¶ 4.  A division of this court reversed and concluded that "when a settlement agreement is clearly intended to cover all categories of loss for which restitution could be imposed, the defendant has met his burden of going forward."  *Id.* at ¶ 29. Like the division in *Stanley,* the *Gregory* division indicated that the prosecution would have the opportunity to rebut the inference of double recovery on remand.  *Id.* at ¶ 30.

### D.    Analysis

¶ 34    Eddington contends that the sentencing court erred by concluding that the GoFundMe donations were "unearmarked" (as in *Lassek*) and argues that this case is closer to *Stanley* and *Gregory* because the GoFundMe screenshots indicated that Sadler's sister requested donations in part because "[o]ur family needs financial assists [sic] paying for . . . cremation and services for [Sadler]."  We disagree.

¶ 35    The divisions' reasoning in *Stanley* and *Gregory* relied on the existence of an enforceable contract (in both cases, a settlement agreement) in which both parties expressed an intent to

---

[2] The court excluded a small portion of the requested amount for reasons not relevant here.

17

compensate the victims for losses arising from the crimes committed against them, including losses covered by restitution. *Stanley*, ¶¶ 27-28; *Gregory*, ¶¶ 27-29. In contrast, a request for monetary gifts (even a request that contemplates a use for the funds) doesn't create a "contract" that "designate[s] the proceeds as being for any particular purpose," nor does it indicate that the gift giver intends for the recipient to spend the funds in a specific way. *Stanley*, ¶¶ 24, 27; *see Gregory*, ¶ 27 (focusing on "the intent of the parties"). As the district court noted, absent evidence that the donated funds are required to be used in one or more specific ways, there are no strings attached to donations or other monetary gifts. In sum, we conclude that this case is closer to *Lassek* because there is no agreement in which both Sadler's family and the donors

expressed an intent to use donated funds for any particular purpose.[3]

¶ 36 We aren't persuaded otherwise by the language of the compensation act. We need not (and do not) decide whether a monetary gift is a "collateral sum" that triggers the victim's obligation to reimburse the CVCB under section 24-4.1-110 because the CVCB is a victim in its own right, and Eddington (1) didn't present any evidence that the CVCB actually received a

---

[3] We also note that the divisions' reasoning in *Stanley* and *Gregory* was informed partly by the restitution statute's prohibition on "double recovery" in certain circumstances. *People v. Stanley*, 2017 COA 121, ¶¶ 20, 30-32; *People v. Gregory*, 2019 COA 184, ¶¶ 24, 29. Both divisions noted that the restitution statute provides that a defendant is entitled to a setoff to or reduction in the amount of restitution owed when the victim has otherwise been compensated (1) by the defendant; (2) by amounts recovered by the victim in any federal or state civil proceeding; and (3) by amounts the victim has received or is entitled to receive from benefits or reimbursement under an insurance policy. *Stanley*, ¶¶ 20-21; *Gregory*, ¶ 24; § 18-1.3-603(3)(b)(II), C.R.S. 2025 (The court may decrease restitution "[i]f the defendant has otherwise compensated the victim . . . for the pecuniary losses suffered."); § 18-1.3-603(6) (Restitution "shall be set off against any amount later recovered as compensatory damages by such victim in any federal or state civil proceeding."); § 18-1.3-603(8)(c)(I) (The "court may not award restitution" for a loss "for which the victim has received or is entitled to receive benefits or reimbursement under a policy of insurance or other indemnity agreement."). There is no similar statutory entitlement to a reduction or setoff in restitution when the victim has received monetary gifts.

19

refund from Sadler's family; (2) doesn't otherwise contest the amount that the CVCB paid to Sadler's family; and (3) doesn't contest that his conduct proximately caused the economic loss. Further, Eddington doesn't direct us to any language in the restitution statute or the compensation act (and we can find none) that requires a court to reduce the amount of restitution simply because a victim received a monetary gift. Thus, the court didn't err by ordering him to pay the CVCB the full amount of the compensation that the CVCB paid to Sadler's family.

## IV. Disposition

¶ 37    The sentence and restitution order are affirmed.

JUDGE J. JONES and JUDGE MEIRINK concur.